*Decision will be entered under Rule 50.*

STERN BROTHERS & CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19579. Promulgated February 8, 1951.

296

*Reece A. Gardner, Esq., John H. McEvers, Esq.,* and *G. Lee Burns, Esq.,* for the petitioner.

*George E. Gibson, Esq.,* for the respondent.

308

OPINION.

HILL, *Judge:* The first question for our determination arises from two contentions made by petitioner concerning the computation of its excess profits net income for the taxable years 1942 through 1945. Petitioner, which computed its excess profits credit based on invested capital, claims first that dividends received on certain of its securities in each of these years should be allowed as a credit in computing its excess profits net income for that year. Furthermore it claims that gains realized from sales and liquidating dividends of certain of its securities in each of these years should be excluded in computing its excess profits net income for that year.

Section 711 (a) (2) (A) of the Code, as amended by section 211 (a) of the Revenue Act of 1942, states that "The credit for dividends received shall apply, without limitation, to all dividends on stock of all corporations, except that no credit for dividends received shall be allowed with respect to  *  *  *  dividends on stock which is not a capital asset" in computing excess profits net income. Section 711 (a) (2) (D) of the Code, as amended by section 207 (e) of the Revenue Act of 1942, states that "There shall be excluded gains and losses from sales or exchanges of capital assets held for more than 6 months" in computing excess profits net income. Thus the question before us is whether certain securities from which petitioner received dividends and on which it realized gains during the taxable years were "capital assets" within the meaning of section 117 (a) (1) of the Code. Section 117 (a) (1) defines "capital assets" in material part as constituting

 *  *  *  property held by the taxpayer  *  *  *, but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business  *  *  *.

Petitioner contends that it acquired and held all the securities in controversy on its own account as investments rather than for sale

to customers, and consequently that they were capital assets during the taxable years. On the other hand, respondent argues that the securities in question were not held as investments but were a part of petitioner's stock in trade as a dealer in securities, and thus they were not capital assets during the taxable period in question.

At the outset we note that this Court has consistently held that a taxpayer may be a dealer as to some securities and he may also hold similar securities for investment or some other purpose than for sale to customers. As to the latter securities they properly constitute capital assets within the meaning of section 117 (a) (1). *E. Everett Van Tuyl*, 12 T. C. 900, *Carl Marks & Co.*, 12 T. C. 1196, and *Stifel, Nicolaus & Co.*, 13 T. C. 755. Furthermore, a dealer in securities may acquire securities for the purpose of sale to customers and later change his purpose and hold them for investment. *Carl Marks & Co., supra.* Finally, it is well established that a dealer may transfer securities actually held for investment out of inventory into a separate account without obtaining permission from the Commissioner to do so. *Carl Marks & Co., supra,* and *Stifel, Nicolaus & Co., supra.*

Whether petitioner held the securities at issue primarily for sale to customers in the ordinary course of business or on its own account for some other purpose, such as investment, is essentially a question of fact to be determined in view of all the circumstances surrounding each security. No one element is normally decisive in itself. The purpose for which each security was held during the taxable years involved is the critical factor in determining its character. *Carl Marks & Co., supra.* A dealer's expressed intent to hold certain securities for purposes other than sale must be supported by conduct on his part in regard to such securities which is clearly consistent with that intent. The dealer's treatment of securities held on his own account for investment must differ materially from his treatment of securities held for sale to customers. In many instances this has been accomplished by some form of segregation, on the books or physically or both. While the lack of any such segregation has great significance, yet it would be exalting one factor for consideration into a *sine qua non* to say that the absence of such segregation in itself conclusively shows the securities in question were not held for investment.

Turning to the 36 securities at issue, petitioner has sought to distinguish the particular shares of stock and bonds involved from those it held for sale to customers by asserting that they were never carried on its position sheets in the trading department as available for sale. While there is considerable testimony to this effect, we can not rely on this test, first, because the position sheets used during the taxable years are not in evidence to support this testimony and, secondly, because petitioner's president testified that the reason for estab-

lishing an investment account was that securities held for investment, which were not listed on position sheets, were mistakenly sold to customers.

The variation in the treatment of these 36 securities by petitioner makes it impossible to categorize them generally as primarily held for sale to customers or otherwise. The manner in which they were handled on petitioner's books does serve to divide them into four main groups for purposes of discussion, namely, securities acquired by petitioner prior to March 20, 1943, which were transferred from inventory to the investment account on that date; securities acquired by petitioner prior to March 20, 1943, which were transferred from inventory to the investment account subsequent to that date during the taxable years; securities acquired by petitioner prior to March 20, 1943, which were never transferred from inventory throughout the taxable years, and securities acquired by petitioner after March 20, 1943, which were placed in the investment account at once.

We turn first to the group of securities acquired by petitioner prior to March 20, 1943, which were transferred from inventory to the investment account on that date. Petitioner received its dividends or gains from several of these securities only in 1944 and/or 1945. The 1,650 shares of Series A, common stock of Long Bell Lumber, the 386 shares of Oregon Lumber, the 586 shares of Orpheum Theatre Corporation, and the 1,184 shares of Pickering Lumber common stock meet this test. Due to this fact we are not concerned with whether they were acquired and held for sale to customers or for some other purpose prior to March 20, 1943, but need only determine their character during the taxable years 1944 and 1945. By their transfer from the inventory account to the investment account petitioner clearly segregated these shares of stock from its dealer business and they were not available for sale to customers thereafter. We thus found as a fact that the above securities were held for investment during the taxable years 1944 and 1945. We now hold that they were capital assets during these 2 years.

In the case of one security, bonds of St. Louis Railway, petitioner received its only income, therefrom during the taxable period on January 28, 1943, when it sold $10,000 par value of such bonds to a broker. This transaction occurred prior to the establishment of the investment account on March 20, 1943, while such bonds were still carried in inventory along with all other securities possessed by petitioner. Thus the status of this security must be determined before petitioner made any segregation of its stocks and bonds. There were three types of securities in inventory prior to March 20, 1943. Some securities were owned by petitioner and held primarily for sale to its customers. Some were owned by petitioner and held for investment or some purpose other than sale. Other securities carried in inventory

were not owned by petitioner, but were in its possession as purchasing or selling agent for its customers. As to this last group of securities petitioner was merely a broker. When it bought these securities, it did not buy them for itself but for its customers. When it sold those securities, it did not sell them to customers, but for customers. It never acquired and held such stocks and bonds for sale to customers or for any other purpose.

The fact that a particular security is carried in general inventory alongside securities which are a part of the dealer business does not exclude the possibility that it was acquired and is held for investment and constitutes a capital asset. Thus in *E. Everett Van Tuyl, supra, Carl Marks & Co., supra,* and *Stifel, Nicolaus & Co., supra,* we held that certain securities originally carried in a dealer's inventory or trading account were nevertheless acquired and held for investment at all times. The test to determine the character of a particular security where there has been no segregation of securities held for sale and those held for investment, is whether the taxpayer has dealt in this type of security with his customers as a part of his dealer business, or whether the taxpayer has only traded in this type of security on his own account outside the circle of his customers. The fact that the taxpayer has purchased or sold this type of security as a broker for its customers is not determinative of the character of the shares which it owned. It does not signify that he has been a dealer in this type of security. *Seeley* v. *Helvering,* 77 Fed. (2d) 323.

Here, petitioner never dealt in the bonds of St. Louis Railway while they were carried in inventory. The purchase and sale of these bonds as a broker for its customers is the only activity reflected on petitioner's books. We therefore found as a fact that petitioner held the St. Louis Railway bonds for investment prior to March 20, 1943. We now hold that they were a capital asset in 1943.

Petitioner received dividends and/or gains from the rest of the securities in this first group both prior and subsequent to the critical date of March 20, 1943. Thus we must determine their character both before and after they were segregated in the investment account. It is clear they all were held for investment purposes after March 20, 1943, since they were not available for sale to customers thereafter, and we found this as a fact. Therefore, we hold that the 1,136 shares of Central Coal, the 1,000 shares of Central Surety, the 668 shares of Employers Reinsurance, 200 shares of Lehman, the 160 shares of Pickering Lumber preferred, the 13,848 shares of Central Utility, the 12,500 shares of Inland Mortgage, the 200 shares of Commonwealth Edison, the 300 shares of Deep Rock Oil, the 200 shares of Nash Kelvinator, and the bonds of Missouri Pacific R. R., were capital assets after March 20, 1943. One exception to this holding is 105 of the 305 shares of Lehman Corp. stock in issue. They were not trans-

ferred to the investment account during the taxable years but remained in general inventory along with securities held for sale to customers. Therefore we found as a fact these particular shares were held primarily for sale to customers after March 20, 1943, and we now hold they were not capital assets after that date.

We have a further determination to make as to the above stocks and bonds, whether they were acquired and held primarily for sale to customers or for some other purpose previous to March 20, 1943. Again the test to determine the character of each security, where there has been no segregation, is whether shares of stock or bonds of this type carried in inventory were dealt in by petitioner with its customers and thus formed a part of its dealer business. As to the 1,136 shares of Central Coal, the 1,000 shares of Central Surety, the 668 shares of Employers Reinsurance, the 305 shares of Lehman and the 460 shares of Pickering Lumber preferred stock, the evidence shows in each instance that petitioner dealt in shares of this type of security carried in inventory. We found as a fact they were all acquired and held primarily for sale to customers until March 20, 1943. We now hold that the above securities were not capital assets before that date.

We found as a fact that the 13,848 shares of Central Utility, the 12,500 shares of Inland Mortgage, the 200 shares of Commonwealth Edison, the 300 shares of Deep Rock Oil, the 200 shares of Nash Kelvinator, and the bonds of Missouri Pacific R. R. were acquired and held by petitioner for investment purposes prior to March 20, 1943. The evidence reveals that petitioner did not handle the first two types of securities either as a dealer or as a broker prior to March 20, 1943, and as to the other types of securities it purchased and sold them only as a broker for its customers. Thus none of the above types of securities were included in petitioner's dealer business before their segregation. They underwent no change in their character by transfer to the investment account. We now hold that the above securities were capital assets prior to March 20, 1943.

We now take up the second group of securities, those which were acquired before March 20, 1943, but were not transferred from inventory to the investment account until subsequent to that date during the taxable years. The two securities involved, Federal Water and Union Labor were not transferred until December 1, 1944, and April 20, 1945, respectively. Dividends were received on the stock of both Federal Water and Union Labor in 1943, 1944, and 1945 so that we must examine their status both before and after their transfer. The particular shares at issue of both corporations were not available for sale to customers after their segregation so it is clear that they were not a part of the dealer business after the critical dates when they were transferred and we so found. We now hold that the shares of both securities were capital assets after their respective dates of trans-

fer. But we must examine their status prior to these two dates. In determining whether securities carried in inventory are held primarily for sale or not, it is of real significance that a means of segregation has been furnished for securities not involved in the dealer business. Here, such a means had been created on March 20, 1943, by petitioner's president for the sole purpose of preventing its investment securities from being mistakenly sold by its salesmen. Under such circumstances if no explanation is given for the failure to segregate securities from those held for sale to customers until long after it is possible to do so, the normal implication is that such stocks were held for sale until the actual date of segregation from the dealer business. Strong affirmative evidence must appear to overrule such a conclusion. In this situation the mere fact that there has been no actual dealer transactions in a security is not enough in itself to indicate that it was not held for sale to customers, for presumably this lack of dealer activity reflects only the unsalability of the stock to customers rather than the dealer's intent to hold it apart from his dealer operations.

As to the stockholdings in both Federal Water and Union Labor, no explanation is offered for petitioner's failure to transfer them to the investment account on March 20, 1943. Nor are there any strong circumstances appearing to upset the normal inference therefrom in the case of Federal Water. Actually there is the additional factor that petitioner actively dealt in this security prior to December 1, 1944. Therefore, we found as a fact that petitioner held the 200 shares of this stock primarily for sale to customers until December 1, 1944. We now hold such shares did not constitute capital assets before December 1, 1944, but were capital assets after such date. The situation is quite different in regard to the Union Labor stock. There is additional evidence strongly persuasive of the fact that the $13\frac{1}{3}$ shares were acquired and held for other purposes than the dealer business. The 10 shares originally purchased were bought as qualifying shares for petitioner's president as a director of Union Labor and the remaining $3\frac{1}{3}$ shares were received as a stock dividend. Furthermore, Union Labor reserved the right at all times to repurchase its own stock, so that shares thereof were not freely salable. Finally, the number of shares acquired by petitioner is far below the normal quantity of a security carried by a leader for its customers. In view of all these circumstances, we found as a fact that petitioner acquired and at all times held the Union Labor stock to qualify its president for a directorship rather than for the purpose of sale to customers. We now hold that the shares in question were capital assets both prior and subsequent to April 20, 1945.

We next take up the third group of securities, those acquired by petitioner prior to March 20, 1943, but which remained in inventory,

throughout the taxable years. Nothing appears in the evidence to explain why this large group of stocks allegedly held for investment was not segregated in the investment account on March 20, 1943, or even in the remaining taxable period under consideration. As to many of these stocks, it is true that the books of petitioner reveal no dealer transactions in such securities, but due to the reasons already set forth, this factor is not in itself enough to obviate the conclusion they were held for sale to customers throughout the taxable years. With the exception of the Cook Paint stock there is no significant evidence supporting the view that they were held for investment on petitioner's own account. Therefore, we found as a fact that the 100 shares of Atlantic Refining, the 200 shares of Atlas Corp., the 500 shares of Colgate, the 165 shares of Commercial National Bank, the 3,392 shares of Continental Oil & Asphalt, the 100 shares of Gimbel Brothers, the 900 shares of Jonas & Naumburg, the 50 shares of Missouri Gas, the 270 shares of Pyramid Life, the 1,000 shares of Roosevelt Field, Inc., and the 130 shares of Kansas City were acquired and held for sale to customers during the taxable years. We now hold that such securities were not capital assets during the taxable years. As to the 60 shares of Cook Paint, special circumstances reveal a different intent on petitioner's part in acquiring them. They were purchased to qualify D. H. O'Leary, an employee of petitioner, on the board of directors of Cook Paint. Furthermore, petitioner at once entered these shares in a special account in general inventory apart from the shares of this security in which petitioner dealt. Under these circumstances we found as a fact that petitioner acquired and always held the 60 shares for the purpose of qualifying an employee on a board of directors. We now hold that the 60 shares were a capital asset throughout the taxable years.

The final group of securities is made up of those stocks which petitioner acquired subsequent to March 20, 1943, and entered at once in the investment account. Those securities falling in this category are 20 shares of Advertising & Sales, the 150 shares of Commerce Trust, the 300 shares of Lockheed Aircraft, the 190 shares of National Bank of Detroit, the 200 shares of Union Bag, and 200 of the 460 shares of Socony-Vacuum in controversy. It is true that as to the 200 shares of Union Bag, they were first entered in general inventory, but the books of petitioner reveal this entry was a mistake, and when the error was discovered, the shares were transferred to the investment account. By segregating the above stocks from its dealer business at the time of their purchase and not making them available for sale to customers thereafter, petitioner clearly manifested its intent to acquire and hold them for investment purposes and we so found. We now hold that

the above-listed shares of stock were capital assets during the taxable years. As to the 260 other shares of Socony-Vacuum at issue, they were entered in general inventory upon acquisition and remained there through 1945. Such different treatment of these shares offers the strongest sort of evidence that petitioner intended to hold them for sale to customers during the taxable years, and, in the absence of any evidence to support a contrary intent, we found this to be a fact. We now hold that these 260 shares of Socony-Vacuum were not capital assets during the taxable period.

We held above that 200 shares of Lehman Corporation stock were capital assets after March 20, 1943, while 105 shares of this stock did not constitute a capital asset at any time during the taxable years. A subsidiary issue concerning this stock arises from an alternative contention of petitioner that in the event Lehman Corporation stock was not a capital asset, nevertheless a dividend of $735.05 received in 1945 was a capital gain dividend of a regulated investment company within the meaning of section 362 (b) (7)[1] of the Code and therefore excludible from petitioner's excess profits net income for 1945 by virtue of section 362 (b) (6).[2] Respondent challenges this contention on the ground that petitioner failed to meet its burden of proving that Lehman Corporation was a regulated investment company, as defined by section 361, by the evidence introduced at the hearing.

Petitioner has established to our satisfaction a prima facie case that Lehman Corporation was a regulated investment company within the meaning of the statute in 1945. Respondent offered no evidence whatsoever to prove that Lehman Corporation was not a regulated investment company within the statute, nor was it able to discredit the testimony of petitioner's secretary in any manner. Under these circumstances we hold that Lehman Corporation was a regulated investment company in 1945 within section 361 and that $735.05 of the special dividend paid by it in that year was a capital gain dividend within section 362 (b) (7).

---

[1] SEC. 362. TAX ON REGULATED INVESTMENT COMPANIES.

\* \* \* \* \* \* \*

(b) METHOD OF TAXATION OF COMPANIES AND SHAREHOLDERS. \* \* \*

\* \* \* \* \* \* \*

(7) A capital gain dividend means any dividend or part thereof which is designated by the company as a capital gain dividend in a written notice mailed to its shareholders at any time prior to the expiration of thirty days after close of its taxable year. If the aggregate amount so designated with respect to a taxable year of the company is greater than the excess of the net long-term capital gain over the net short-term capital loss of the taxable year, the portion of each distribution which shall be a capital ain dividend shall be only that proportion of the amount so designated which such excess of the net long-term capital gain over the net short-term capital loss bears to the aggregate amount so designated.

[2] SEC. 362 (b) (6). A capital gain dividend shall be treated by the shareholder as gains from the sale or exchange of capital assets held for more than 6 months.

Effect to all the above holdings will be given in the recomputation of petitioner's excess profits tax liability for each of the taxable years under Rule 50.

The next question for our decision is whether respondent was authorized to adjust certain items on petitioner's tax returns in accordance with the accrual basis of keeping books and filing returns. Petitioner claims that it kept its books on a strict cash basis which clearly reflected its income during the taxable years. Thus petitioner contests the adjustment made to its accumulated earnings and profits at the beginning of each of the taxable years by subtracting therefrom the income and excess profits taxes due the preceding year. On the same ground petitioner also challenges $356.63 of the $830.16 disallowance made by respondent of the deduction for Federal and state unemployment compensation taxes claimed for 1942. The $356.63 constituted that portion of these taxes which was accruable in 1941, though petitioner did not pay this amount until 1942. It is respondent's position that petitioner used a hybrid system of accounting which was predominantly on an accrual basis, and under such circumstances the Commissioner is empowered by section 41 of the code to adjust items on petitioner's returns in accordance with the accrual basis. Section 41 requires that net income be computed in accordance with the method of accounting regularly employed in keeping the books of a taxpayer, but if no such method of accounting has been employed, or if the method employed does not clearly reflect the income, then it authorizes computation in accordance with such method as in the opinion of the Commissioner does clearly reflect the income.

While we are handicapped by the lack of relevant data from petitioner's books in the evidence, yet we conclude from an examination of petitioner's returns and from testimony of its employees that petitioner kept its books and filed its returns on a hybrid system of accounting during the taxable period involved. Certain factors point to the use of the cash basis by petitioner. When it purchased a security, the security was not entered on its books until it was paid for. When a security was sold, the security remained on petitioner's books as an asset until cash came in to take its place. It was not petitioner's practice to make credit sales of securities. It never entered on its books any receivables from sales or payables from purchases. All operating expenses were paid as far as possible prior to December 31 of each year. We note also that on its income and declared value excess-profits tax returns petitioner stated that it was on a cash receipts and disbursements basis. This fact in itself is not determinative of whether petitioner was on the cash basis. *Aluminum Castings Co.* v. *Routzahn*, 282 U. S. 92, and *Denman* v. *Squire*, 111 Fed. (2d) 921.

On the other hand, compelling facts indicate that petitioner was keeping its books and reporting income in the taxable years on the accrual basis. At all times petitioner used inventories to determine its gross income, and securities carried in inventory were valued at cost or market whichever was lower. Furthermore certain items listed on balance sheets in petitioner's income and declared value excess-profits tax returns are peculiar only to an accrual system of accounting. Accounts receivable and accounts payable were so listed in each of the taxable years. Apparently the accounts receivable were deposits of cash petitioner placed with underwriting firms at various times in connection with a future issue of securities and the accounts payable constituted cash deposited by customers in advance of receiving securities from petitioner. In petitioner's return for 1945 "Social Security due Industrial Mortgage Investment Co." was listed as an accrued expense. "Unclaimed checks" were set out as a liability in returns for all taxable years. Therefore we found as a fact that petitioner was on a predominantly accrual basis of reporting income in the years 1942–45.

It is well settled that a taxpayer generally may not make returns upon a basis of receipts and disbursements as to some items of his business and on an accrual basis as to other items of the same business, for such a return does not reflect true net income. *Massachusetts Mutual Life Insurance Co.* v. *United States*, 288 U. S. 269; *United States* v. *Anderson, et al.*, 269 U. S. 422. Where, as here, a taxpayer employs a hybrid system of accounting which does not reflect true net income, the Commissioner may correct the returns so as to reflect true income. *Hygienic Products Co.*, 37 B. T. A. 202, affd.; 111 Fed. (2d) 330, certiorari denied, 311 U. S. 665; *Schuman Carriage Co., Ltd.*, 43 B. T. A. 880. In such a situation the Commissioner has a wide discretion as to whether the method of accounting employed by a taxpayer correctly reflects his income. Where his discretion is not abused, the court will sustain his determination. See *Hardy, Inc.* v. *Commissioner*, 82 Fed. (2d) 249; *Niles Bement Pond Co.* v. *United States*, 67 Ct. Cls. 693, affd., 281 U. S. 357; and *Schuman Carriage Co. Ltd., supra.*

Both long established regulations and court decisions provide a foundation for the action of the Commissioner here in adjusting items on petitioner's returns during the taxable years in accordance with the accrual basis of accounting. Regulations 111, section 29.22 (c)–1 states in part:

Need of inventories.—In order to reflect the net income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. * * *

Petitioner was certainly selling "merchandise" when it acted as a dealer in securities and thus properly used inventories. Regulations 111, section 29.41-2 provides in pertinent part that "in any case in which it is necessary to use an inventory, no method of accounting in regard to purchases and sales will correctly reflect income except an accrual method." In *Aluminum Castings Co.* v. *Routzahn, supra,* page 99, the Court held:

> * * * The use of inventories, and the inclusion in the returns of accrual items of receipts and disbursements appearing on petitioner's books, indicate the general and controlling character of the account, * * * and support the finding of the trial court that books and returns were on the accrual basis. * * *

In *A & A Tool & Supply Co., et al.* v. *Commissioner,* 182 Fed. (2d) 300, the Court of Appeals for the Tenth Circuit declared:

> * * * Ordinarily when there are inventories to consider, the accrual basis is the only method which will properly reflect the taxpayer's income. * * *

Specific authority for the adjustments made by the Commissioner to the accumulated earnings and profits stated by petitioner on its excess profits tax returns is set forth in Regulations 112, section 35.718-2 (a). It provides in part:

> * * * In computing accumulated earnings and profits as of the beginning of the taxable year, a taxpayer keeping its books and making its income tax returns on the accrual basis shall subtract the income and excess profits taxes for the preceding taxable year. * * *

This provision was quoted with approval in *Atlumor Manufacturing Co.,* 12 T. C. 949, 954.

We therefore hold that respondent did not abuse his discretion under section 41 in making adjustments on petitioner's returns in accordance with the accrual basis.

Petitioner contends, in the event of such a holding, the respondent still erred in accruing in each of the taxable years 1942-44 and then subtracting from accumulated earnings and profits in the succeeding year the excess profits taxes here in dispute. This assertion is based on the well-settled rule that a tax which is being contested does not accrue until liability therefor is finally determined. *Dixie Pine Products Co.* v. *Commissioner,* 320 U. S. 516, and *Security Flour Mills Co.* v. *Commissioner,* 321 U. S. 281.

Petitioner's argument is based upon a failure to distinguish the accrual of Federal income and excess profits taxes called for by Regulations 112, section 35.718-2 (a) from the more usual accrual for purposes of deduction from, or inclusion in, income. The accrual of these taxes results in no deductible expense in computing taxable

income. The sole reason for the accrual of such taxes is to properly reflect the amount of a corporation's accumulated earnings and profits at the beginning of a taxable year for invested capital credit purposes. If accumulated earnings and profits at the start of any taxable year are to show the true financial status of an accrual basis taxpayer, an adjustment must be made for income and excess profits taxes arising in the preceding year. Thus the accrual called for by this subsection of the Regulations is simply an adjustment to accumulated earnings and profits.

To effectuate the required adjustment, income and excess profits taxes must be accrued by an accrual basis taxpayer in the year they arose regardless of whether its liability therefor became definite and ascertainable in amount in that year or a subsequent year. The fact that liability for either or both taxes is contested does not postpone accrual of liability to a later year. To hold otherwise and invoke the rule that a contested tax is accruable only in the taxable year when liability is finally determined would completely defeat the purpose of the Regulation. Thus by simply contesting liability for income and excess profits taxes a taxpayer could postpone their accrual until after the year in which they arose, and its accumulated earnings and profits for the succeeding year would never be diminished by the amount of these taxes. In fact if petitioner's argument were upheld in the present case, it would not accrue its excess profits tax liability for each of the years 1942–45 prior to 1951, the year of our determination of liability, and its accumulated earnings and profits at the beginning of each of the years 1943–45 would never be adjusted by the amount of the taxes arising in the preceding year. We can not think that such a result was intended by Congress. We therefore reject the contention of petitioner and hold that petitioner's excess profits tax liability for each of the years 1942–44, to the extent determined under Rule 50, must be accrued in that year and must be subtracted from its accumulated earnings and profits at the beginning of the succeeding year.

As a corollary to the above holding we also hold that to the extent excess profits tax liability is determined petitioner is entitled to accrue as an asset in each of the years 1942 through 1944 the postwar refund credit provided by section 780 of the Code and add this amount to its accumulated earnings and profits at the beginning of the succeeding year. See *Altschul's, Inc.*, 9 T. C. 697, and *Gorman Lumber Sales Co.*, 12 T. C. 1184.

Since the amount of petitioner's tax liability for each of the taxable years must be recomputed,

*Decision will be entered under Rule 50.*