**BROWN et al. v. COWDEN LIVESTOCK CO.**

No. 12679.

United States Court of Appeals
Ninth Circuit.

March 12, 1951.

Rehearing Denied April 23, 1951.

Evans, Hull, Kitchel & Jenckes, Norman S. Hull and John E. Madden, all of Phoenix, Ariz., for appellant Brown et al.

Snell & Wilmer, Mark Wilmer and James A. Walsh, all of Phoenix, Ariz., for appellant Cowden Livestock Co.

Before DENMAN, Chief Judge, POPE, Circuit Judge, and GOODMAN, District Judge.

GOODMAN, District Judge.

This litigation, commenced in the state court and removed to the United States District Court of Arizona, on the basis of diversity of citizenship, 28 U.S.C.A. §§ 1331, 1391, resulted in a money judgment in the court below in favor of appellee-plaintiff. The question presented on the appeal is whether the appellee was entitled to recover from appellants-defendants a portion of the purchase price of cattle paid in full by appellants to an alleged agent of appellee who failed to make full payment of the amount collected by him to the appellee.

The facts necessary to be stated are substantially as follows:

In October of 1946, appellee, an Arizona corporation, one Roy Adams of Tucson, Arizona and one Guy Porter of Amarillo, Texas, all engaged in the business of raising, buying and selling cattle, entered into an arrangement for the purchase, feeding and sale of some 1900 head of steers. Appellee paid the purchase price of the steers and Adams and Porter were to feed and care for the cattle and arrange for their sale, both the profits and losses to be shared equally among the three.

In the spring of 1947, after selling part of the cattle in Texas, Adams shipped the remainder to appellants, also cattle raisers and dealers of Santa Maria, California, in his own name and without disclosing the interest of appellee, upon an arrangement whereby appellants were to have a half interest in the cattle and were to feed the cattle for a daily feeding charge and upon their sale to remit to Adams the sales price after deducting the feeding charge, and, appellants' one half share of the profits of sale. Adams reported to appellee the arrangement as to the feeding, and appellants' share of the profits, but did not report his purported immediate transfer of a half interest in the cattle to appellants.

On May 9, 1947, appellants, having been advised by Adams, that appellee had a record of the loading weights of the cattle, telegraphed appellee to send on the weights of the "Adams Cattle." In reply appellee wrote appellants on May 15th giving the weights of the "Adams Cattle" and requesting appellants to "please make the sales for the account of Cowden Livestock Co. and remit the proceeds to us." However just prior to the receipt of this letter by appellants, the latter had forwarded a check to Adams for a substantial portion of the sales price of certain of the cattle, and, later, on July 5th gave Adams at Santa Maria, a check for the balance of the sales price together with a statement of the account. Adams did not cash the checks until after July 8th.

On or about July 8, 1947, in a telephone conversation between Adams in Tucson and appellee in Phoenix, Adams informed appellee that appellants had sent him the money for the cattle and thereupon appellee asked Adams to come up (to Phoenix) and "settle up the deal." Thereupon Adams cashed the checks which appellants had theretofore sent him.

On July 16, 1947, Adams came to Phoenix and met with appellee. He had with him a full statement of the account which was examined and checked by Adams and appellee. As a result, it was determined that, after allowing for Adams' and Porter's share of the profit of the transaction, there was due to appellee the sum of $156,794.49. Thereupon Adams handed to appellee two personal checks made payable to appellee, one for the sum of $112,000.00 and one in the sum of $44,794.49. Adams stated to appellee that his check for $112,000.00 might be cashed immediately, but he requested appellee not to deposit the

$44,794.49 check until the next week, saying that the money would be in the bank to cover it by Monday of the next week. He asked for this consideration for the reason, as he stated, that he had used a portion of the money received from appellants to buy "another bunch of cattle" and that he would not have the returns from that shipment until Monday of the next week. Appellee agreed to this procedure. The president of appellee corporation admitted that this constituted a settlement with Adams of the three party arrangement between appellee, Adams and Porter and further testified that he had no reason to doubt Adams' financial ability as they had had other transactions wherein Adams had paid out of his personal account to appellee sums as large as that involved in the July 16th transactions.

Appellee held the $44,794.49 check for the specified time and then deposited it. The check was returned for insufficient funds about July 23, 1947. The next day the secretary-treasurer of appellee notified Adams as to what had happened and Adams stated that the check should be redeposited. This was done. On July 31, the check was again returned to appellee as uncollectible because of insufficient funds. In the early part of August appellee again contacted Adams and then finally determined that it would be unable to collect the amount of the check from him.[1] On August 9, 1947 appellee wrote appellants for the first time since May 1947 and demanded payment of the sum of $57,612.53, the sum which it claimed it (the appellee) was entitled to receive from appellants as the balance due on account of the purchase price of the cattle. Suit followed upon the refusal of appellants to comply with this demand.

The district court rendered judgment in favor of appellee for the sum of $44,794.49, apparently concluding that appellee was only entitled to recover for its own share of the proceeds under the terms of the three party agreement. It thus limited

appellee's recovery to the amount of Adam's bad check.

It is appellee's contention that at all times it was the owner of the cattle and that Adams had no authority to collect any of the money due from appellants and further that, after appellee's letter of May 15th to appellants, any payment by the latter to Adams was at the peril of appellants. It is difficult to reconcile the amount of the judgment rendered by the district court with this contention of appellee. Because, if appellee is correct, the judgment should have been for the full balance of the unpaid purchase price not actually received by appellee.[2] We do not know the considerations which motivated the District Court to limit appellants' liability to appellee's own share of the proceeds under the three party agreement.

As of July 16, 1947 Adams had already received and had in his possession the full amount of the sales price. This amount appellants and Adams had already agreed was the amount due. As of the same date Adams and appellee also agreed it was the correct amount due. Up to this point (i.e. July 16th) all of the preceding events would necessarily have to be appraised in order to determine whether or not, in law, Adams had the authority, either express or implied, to collect the sales price from appellants for appellee who claimed to be his principal. But, despite the great amount of effort devoted in the briefs and argument to the exposition of the legal formulae claimed by each side to be applicable and determinative of the issue of liability, we deem it unnecessary to consider these issues. For we believe that the cause may be and should justly be decided upon the basis of the legal effect of the transaction between Adams and appellee conducted on July 16th et seq.

In our opinion, whether these July 16th transactions amounted to approval of the act of Adams in collecting the purchase price or whether they created a virgin agreement between appellee and

---

1. Adams committed suicide at a later time. (Apr. 7, 1948).

2. In fact, appellee cross-appealed, claiming that the District Court should have awarded judgment for the amount sued for.

Adams, the legal result was the abandonment of the claim, if any, of appellee against appellants and the substitution or creation of a liability from Adams to appellee. This conclusion is required upon a record which shows that there is no dispute as to what happened in the July 16th transactions. The findings of the District Judge in this regard [3] are in effect findings as to the effect of these transactions rather than findings which resolve disputed facts. Hence we do not find ourselves obstructed by the traditional rule not to disturb findings of fact of the trial court. We are therefore free to make our own determination as to the legal conclusion to be drawn.

The record of the July 16th occurrence leads inevitably to the conclusion that the appellee then and there either accepted or created a relationship of creditor and debtor with Adams with respect to the proceeds of sale.[4] While the president of appellee at the meeting of July 16th expressed himself as being unhappy and dissatisfied because Adams had, without the knowledge of appellee, collected the purchase price himself, in spite of appellee's request that the proceeds be remitted directly to it, nevertheless he accepted Adams' checks for the amount which appellee conceded was due it. In addition, appellee extended credit to Adams by deferring the time of presentation of one of Adams' checks. These transactions of July 16th occurred without any knowledge on the part of appellants as to what was going on. In our opinion appellee could not, by a unilateral act on its part, unknown to appellants, create a relationship of creditor and debtor with Adams and also retain the right to proceed against appellants for a loss resulting from a future breach on the part of Adams.

It is unnecessary to decide whether or not the events of July 16th gave rise to a ratification generally of the agency in Adams to act on behalf of his principal including the authority to collect the purchase price. It is sufficient to say that the least that appellee did was to acquiesce in the conduct of Adams in making the collections, and thereby to retroactively give its consent thereto. Little v. Brown, 40 Ariz. 206, 11 P.2d 610; Restatement of Agency § 43(1) Comment (a). It also follows that by the arrangement of July 16th the transaction with appellants was terminated. Thereafter appellee and Adams were dealing between themselves with respect to the proceeds of sale. Neavitt v. Upp, 57 Ariz. 445, 114 P.2d 900; Restatement on Contracts § 421. There can be no doubt about this, for Adams and appellee dealt with each other with the proceeds of appellants' payments in their hands. Furthermore appellee unreservedly accepted its share of the proceeds in the form of Adams' check. It is clear from the record that appellee on July 16th had no doubt as to the firmness of Adams' obligation to it. Appellee was no longer treating Adams as its collecting agent. It thereby gave the clearest indication that it had no intention of holding appellants for payment. Had there been any such intention on the part of appellee, it would have been obligated to forthwith so notify appellants so that the latter might have an immediate opportunity to protect themselves against any claim that they had wrongfully or improperly paid any part

3. "18. Plaintiff, in accepting the checks of Roy Adams, did not ratify or intend to ratify his unauthorized representations that said cattle belonged to him, or his representations that he was entitled to sell the same and collect the proceeds thereof, either for his own account or for the account of plaintiff.

"19. In making settlement with Roy Adams on or about July 16, 1947, plaintiff made such settlement without a full knowledge of all the facts and solely because plaintiff believed the funds were available to make payment to it for the sum due it and to conclude an unsatisfactory handling of its business by said Roy Adams."

4. The settlement sheets (included in appellee's records) were entitled "Cowden Livestock Co. Settlement with Roy Adams on Texas Steer Deal." and contained an entry, apparently made as a result of the July 16th meeting, reading "due from Adams . . . $44,794.49."

of the purchase price to Adams.[5] It is these affirmative acts of appellee, therefore, which caused the loss to it. The risk of loss became appellee's.[6]

If there be any doubt at all as to the absence of any liability of appellants to appellee after July 16th, the doubt must be resolved against appellee because its own acts constituted a clear expression of its own view of the relationship of the parties. We think the rule first announced by Lord Coke and so often followed, that the acts of parties under a contract, before disputes arise, are the best evidence of the meaning of doubtful contractual terms, is applicable here.

We conclude that the judgment below should have been in favor of defendant-appellants. The judgment of the District Court is therefore reversed.

---

5. Indeed such an obligation in fact arose earlier when appellee was informed by telephone by Adams on July 8th that he collected the proceeds from appellants. At that time Adams had not yet cashed appellants' checks.

6. The doctrine of equity that as between two innocent persons, the one whose act caused the loss should bear it, would seem to have some applicability. Hallenbeck v. Regional Agricultural Corp., 47 Ariz. 477, 56 P.2d 1041, 1043.