J. C. BRADFORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ELEANOR A. BRADFORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 35990, 36895. Filed August 18, 1954.

William Waller, Esq., and Lawrence Dortch, Esq., for the petitioners.

Homer F. Benson, Esq., for the respondent.

1060

OPINION.

Bruce, *Judge:*

*Issue I.*

The first question for determination is whether petitioner realized a capital gain or ordinary income upon his distributive share of the profit realized by J. C. Bradford and Co. in 1943 on certain securities. J. C. Bradford and Co. was a dealer in securities. Throughout 1943 it bought and sold securities identical with those in controversy. All of its sales were made to customers of the firm in the ordinary course of business. On April 17, 1943, the securities in controversy, which had been purchased for resale to customers in the ordinary course of business, were transferred on the books of the firm from the "trading account" to the "stock and bond account." There they remained until they, or identical securities, were returned from time to time on the books of the firm to the "trading account." Back in the "trading account" the securities were used to cover prior purchases by customers which had created shortages in that account, were sold to customers in the ordinary course of business, or were intermingled with identical securities constituting the firm's inventory and were presumably sold to customers in the ordinary course of business.

It is evidently petitioner's contention that the appreciation in the value of the stock while in the "stock and bond account" constituted a capital gain, taxable as such, and that upon the return of the stock to the "trading account" the cost of inventory should be increased accordingly. This position is untenable. A capital gain is realized upon the sale or exchange of an asset and not upon its transfer from one ledger account to another.

The proper question for consideration is whether J. C. Bradford and Co. realized a capital gain or ordinary income upon the sale of the securities in controversy. Petitioner contends that upon the transfer of the securities from the "trading account" to the "stock and bond account" they lost their status as securities held for sale to customers, and therefore became "capital assets" as defined by section 117 (a) (1) of the Internal Revenue Code of 1939,[1] applicable for the years in-

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *

volved. Respondent argues that the securities did not lose their inventory status and with this view we are inclined to agree. The short holding period, the failure to identify the particular securities which were placed in the account, the practice of transferring the balance in the account to inventory at the end of the year, the activity in the account, and the lack of any purpose in holding the securities other than to derive a profit upon their resale, tend to show that the account was primarily a reserve to be drawn upon as needed for resale to customers rather than an investment account. Cf. *Schafer* v. *Helvering*, 299 U. S. 171. Be that as it may, the dispositive factor is not whether the securities changed their status upon their transfer to the "stock and bond account," but the purpose for which the securities were held at the time of their sale. In *Pacific Affiliate, Inc.*, 18 T. C. 1175, 1212 (on appeal C. A. 9), it was stated:

This Court has consistently recognized the fact that a taxpayer, such as petitioner herein, may trade in securities on its own account and risk at the same time it is a dealer with respect to similar securities held for sale to customers. *E. Everett Van Tuyl*, 12 T. C. 900; *Carl Marks & Co.*, 12 T. C. 1196; *Stern Bros. & Co.*, 16 T. C. 295; and *George R. Kemon*, 16 T. C. 1026. As to those held for investment or speculation on its own account, the taxpayer is not a dealer and is not entitled to compute income on the inventory method. Such securities properly constitute capital assets. *E. Everett Van Tuyl, supra; Stern Bros. & Co., supra; George R. Kemon, supra*. On the other hand, those acquired and held primarily for sale to customers in the ordinary course of business are specifically excluded from "capital assets" by the statutory definition thereof. However, securities originally acquired and held for either purpose may be freely appropriated to the other purpose at the discretion of the taxpayer exercised in good faith. *Carl Marks & Co., supra*. Therefore, the ultimate question to be resolved is the purpose for which a particular security is held at the time of its sale. Such question is essentially one of fact. *Stern Bros. & Co., supra*.

As is made clear by the foregoing discussion, the fact that the securities were acquired for investment or were held for investment prior to the decision to sell is not controlling. It is the purpose for which the property is held at the time of sale which is important. This is true even though "the taxpayer-seller's motive in selling was to liquidate his investment." *Florence H. Ehrman*, 41 B. T. A. 652, 663, affd. (C. A. 9) 120 F. 2d 607, certiorari denied 314 U. S. 668. Here the securities in controversy were returned to the "trading account" or inventory either to cover customers' purchases through the firm's retail outlet or for future sale to customers in the ordinary course of the firm's trade or business. The firm might have sold the securities through an exchange. But what the firm might have done is not material. It did resort to a method of disposal which in fact required that the securities be submitted and sold to its customers in the ordinary course of its dealer business. *Palos Verdes Corp.* v. *United States*, (C. A. 9) 201 F. 2d 256, 259. We have therefore found as a fact that at the time

of their sale the securities were held for sale to customers in the ordinary course of the firm's trade or business. Cf. *Pacific Affiliate, Inc.*, *supra*, 18 T. C. at p. 1214, where capital gain treatment was not accorded to securities originally held for investment but later "appropriated to retail distribution and sale." Our finding that the securities were not "capital assets" as defined by section 117 (a) (1) eliminates the necessity of determining whether the securities were "held for more than 6 months" within the purview of section 117 (a) (4).

## Issue II.

Petitioner loaned Briley $57,500 in 1942. All of the stock of Mobile Homes, Inc., was pledged as collateral on the note except 375 preferred shares which petitioner received outright as compensation for making the loan. To make the loan petitioner borrowed $57,500 from the American National Bank on his own note, pledging as collateral Briley's note and the collateral thereon.

In August of 1943 Mobile Homes, Inc., had become insolvent and Briley's note was virtually worthless. In order to evidence a bad debt loss, petitioner induced the bank to accept Briley's 90-day note in place of his own, and he signed the note as an accommodation endorser. When the note became due, the bank demanded payment of Briley and he failed to pay. The Mobile Homes, Inc., stock held as collateral was purchased by petitioner at public auction for $1,000. Petitioner paid the bank $53,000 and the bank released him from his liability as endorser. This left the bank with Briley's unsecured note with an unpaid balance of $3,500. Petitioner deducted the $53,000 paid to the bank on his return for the year 1943.

Petitioner contends that the $53,000 he paid to the bank for his release from liability as endorser on Briley's note represented a worthless bad debt. We do not agree. The theory upon which petitioner rests his claim is that upon payment to the bank he became subrogated to the bank's rights against Briley to the extent of the payment. The payment, however, did not satisfy the bank's claim against Briley. The bank retained Briley's note with an unpaid balance of $3,500. Under Tennessee law subrogation cannot take place until the creditor has been paid in full. *Knaffl* v. *Knoxville Banking & Trust Co.*, 133 Tenn. 655, 182 S. W. 232, citing *Columbia Finance & Trust Co.* v. *Kentucky Union Railway Co.*, (C. A. 6) 60 F. 794. See also *Third National Bank in Nashville* v. *Carver*, 31 Tenn. App. 520, 218 S. W. 2d 66; *United States* v. *National Surety Co.*, 254 U. S. 73; *Maryland Casualty Co.* v. *Southern Pac. Co.*, (C. A. 9) 119 F. 2d 672; *National Surety Co.* v. *Salt Lake County*, (C. A. 8) 5 F. 2d 34. *E. A. Roberts*, 36 B. T. A. 549, is not in point, for under the Alabama statutes applicable in that

case the endorser was entitled to commence an action against the principal immediately upon making the payment.

The $53,000 payment made by petitioner to the bank, however, is deductible as a loss under section 23 (e) of the 1939 Code.[2] The loss was incurred in petitioner's "trade or business" of making speculative loans similar to the loan in question. It is also clear that even if the loan was not connected with petitioner's trade or business, the loss was incurred in a "transaction entered into for profit." *Abraham Greenspon*, 8 T. C. 431. The possibility of petitioner recovering in a future year any part of the $53,000 paid to the bank was extremely remote, as Briley was at that time hopelessly insolvent. Petitioner was not required "to be an incorrigible optimist," *United States* v. *S. S. White Dental Mfg. Co.*, 274 U. S. 398, 403, and was entitled to deduct the loss in 1943.

### Issue III.

Relying on *Helvering* v. *Clifford*, 309 U. S. 331; *Higgins* v. *Smith*, 308 U. S. 473; and *Commissioner* v. *Sunnen*, 333 U. S. 591, respondent contends that the income derived from the Mobile Homes, Inc., rights is taxable to petitioner rather than to Eleanor. He argues that the preferred shares were worthless, and, therefore, the transfer of the shares to Eleanor was a subterfuge. The rights, respondent contends, were acquired in return for voting control and were in reality owned by petitioner.

We do not agree that the gift of the preferred shares to Eleanor was a sham or subterfuge. It represented a gift of securities having little actual value but great speculative possibilities. Mobile Homes, Inc., was at that time obligated to redeem the preferred shares and had the power to distribute to Eleanor the rights which she received. However, without the consent of the Federal Reserve Bank and other lending institutions the distribution could have been set aside as a transfer in fraud of creditors. In return for voting control and the retirement of the preferred shares, the Federal Reserve Bank gave its consent on behalf of the creditors. The rights were acquired, nonetheless, from the corporation in return for the stock and not from the creditors in return for voting control and the retirement of the preferred stock. If the relinquishment of the voting control by the petitioner constituted a portion of the consideration furnished for

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

(1) if incurred in trade or business; or

(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; \* \* \*

the rights received by Eleanor, the transfer of voting control to the creditors represented an additional gift by petitioner to Eleanor.

Also, petitioner did not retain "sufficient power and control over the assigned property or over the receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes." *Commissioner* v. *Sunnen, supra,* 333 U. S. at p. 604. It is true that without petitioner's cooperation Eleanor would not have been able to redeem her preferred shares. That, however, was the extent of petitioner's control, and to have exercised it to Eleanor's detriment would not have benefited him. The common stock was utterly worthless, as no distribution could be made on the common until the preferred was retired. Also, the common stock was of no value to the creditors while the preferred shares remained outstanding. Furthermore, the corporation was obligated to redeem the preferred shares once the consent of the creditors had been obtained. But whatever control petitioner had over the redemption of the shares, he retained no control when Eleanor realized gain on the rights she received in return.

Respondent relies heavily upon the fact that the various negotiations were conducted by petitioner on Eleanor's behalf. But the income or gain was attributable entirely to the rights owned by Eleanor and not to the services performed by petitioner. The services were of a character which a husband astute in business affairs would normally perform without compensation for his wife. Cf. *Sax Rohmer,* 21 T. C. 1099; *Henson* v. *Commissioner,* 174 F. 2d 846.

Respondent's next contention is that the assignment of the rights by Mobile Homes, Inc., constituted an anticipatory assignment of income and that the income derived by Eleanor on the rights represented constructive dividends, and hence ordinary income, when received. We will not attempt to analyze respondent's ingenious but involved and tenuous argument upon which he bases the above contention. It will suffice to point out that Eleanor reported the insurance commissions as ordinary income, and has not contended that they should be taxed otherwise. The right to purchase and sell the FHA mortgage loans was nothing more than an option, and its transfer to Eleanor was not an anticipatory assignment of income. Even if the assignment constituted a dividend, it was a dividend received in 1944, a year not before this Court with respect to either petitioner.

It could be argued that the transfer of the rights under the Alabama Power Company contract resulted in an anticipatory assignment of income. Cf. *Commissioner* v. *First State Bank of Stratford,* (C. A. 5) 168 F. 2d 1004, reversing 8 T. C. 831, certiorari denied 335 U. S. 867. However, as Mobile Homes, Inc., had not previously recouped the money advanced to run the wires into the project, it is not known

whether or not the payments received by Eleanor would have resulted in income to the corporation if they had been received by it.

Even if the transfer of the Alabama Power Company contractual rights represented an assignment of income, it did not constitute a dividend. The rights were assigned to Eleanor in redemption of her preferred shares. Under its contract with the preferred stockholders, Mobile Homes, Inc., was required to redeem the preferred shares at that time. And, as the value of the rights received by Eleanor in redemption of her stock certainly did not exceed the amount originally contributed to the corporation in exchange for the stock, the redemption of Eleanor's stock was in no way "essentially equivalent to the distribution of a taxable dividend" within the purview of section 115 (g) of the 1939 Code,[3] applicable for the years involved. Also, as the corporation was hopelessly insolvent at that time, it is highly unlikely that the rights received by Eleanor represented "a distribution of the earnings or profits."

Respondent further contends that Eleanor realized ordinary income, rather than a capital gain, upon the receipt of the Alabama Power Company refunds. He argues that it was not a "gain from the sale or exchange of a capital asset," and was, therefore, not a capital gain within the purview of section 117 (a) (4),[4] applicable for the years involved. We do not agree.

Under section 115 (i) the redemption of Eleanor's stock represented a partial liquidation, and section 115 (c) provides that "amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for stock." Ordinarily, if the value of the right received exceeds the cost basis of the stock redeemed, a gain will be realized by the taxpayer when the exchange is made. But in the instant case the Alabama Power Company's contractual right had no ascertainable fair market value when it was received by Eleanor. Under circumstances indistinguishable from those here present, it was held in *Commissioner* v. *Carter*, (C. A. 2) 170 F. 2d 911, affirming 9 T. C. 364, and *Westover* v. *Smith*, 173 F. 2d 90, that where the contractual right received in exchange for the stock has no

---

[3] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

[4] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

\* \* \* \* \* \* \*

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income.

ascertainable fair market value, no gain is realized until the payments exceed the cost basis and, thereafter, the payments are taxed as capital gains. The above cases rely primarily upon *Burnet* v. *Logan*, 283 U. S. 404, which, we agree, is controlling. The fact that the payments are to be received from a third party rather than from the corporation purchasing the stock is immaterial. The fair market value of the contractual right received is equally unascertainable, and the taxpayer has not received any more of the consideration to be paid. But see the concurring opinion in *Mace Osenbach*, 17 T. C. 797, 804, affd. (C. A. 4) 198 F. 2d 235.

## *Issue IV.*

Respondent has determined that the purchase of the $100,000 note from the American National Bank for $50,000 resulted in ordinary income in the amount of $50,000 to the petitioner or, in the alternative, to Eleanor. We do not agree that the note purchased was an obligation of the petitioner rather than Eleanor. When Eleanor was substituted as the maker of the note, most of petitioner's assets were pledged to the bank as collateral on the $305,000 note. The only other source of payment was petitioner's earnings through his investment banking firm. If the bank had refused to substitute Eleanor as the maker, the firm may well have lost its seat on the New York Stock Exchange, and the bank would have destroyed its chances of collecting both on the unsecured portion of the note assumed by Eleanor and on the notes upon which petitioner remained the obligor. The assumption of the note by Eleanor was not a sham. Although the bank probably expected that the money for payments on the note by Eleanor would be furnished by petitioner, the indebtedness was that of Eleanor's and she was the only person legally obligated to pay.

The purchase of the note for $50,000 resulted in ordinary income in the amount of $50,000 unless the gain constitutes an exempt gift under section 22 (b) (3) of the 1939 Code.[5] *Commissioner* v. *Jacobson*, 336 U. S. 28; *Helvering* v. *American Dental Co.*, 318 U. S. 322. A gift means "the receipt of financial advantages gratuitously." *Helvering* v. *American Dental Co.*, *supra*, 318 U. S. at p. 330. "The situation in each transaction is a factual one. It turns upon whether the transaction is in fact a transfer of something for the best price available or is a transfer or release of only a part of a claim for cash

---

[5] SEC. 22. GROSS INCOME.

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter :

    *        *        *        *        *        *        *

(3) GIFTS, BEQUESTS, DEVISES, AND INHERITANCES.—The value of property acquired by gift, bequest, devise, or inheritance. There shall not be excluded from gross income under this paragraph, the income from such property, or, in case the gift, bequest, devise, or inheritance is of income from property, the amount of such income. * * *

and of the balance 'for nothing'." *Commissioner* v. *Jacobson, supra,* 336 U. S. at p. 51.

The American National Bank had been required by the bank examiner to write off $50,000 of Eleanor's $100,000 note and had presumably taken the appropriate deduction. Cf. Regs. 111, sec. 29.23 (k) (1). The bank had become restless about the note and was willing to sell it to Eleanor, to petitioner, or to anyone else for $50,000 or book value. Upon being informed of this fact, petitioner, acting through his half brother, purchased the note from the bank with $30,000 or $31,000 furnished by him and $19,000 or $20,000 furnished by Eleanor. There is no dispute that the above transaction was in reality a discharge of the indebtedness for $50,000. Eleanor was worth approximately $50,000 after the note was discharged.

The instant transaction did not represent the discharge of a $50,000 indebtedness "for nothing." The bank sold the note for $50,000, a price for which it was willing to sell the note to anyone. Evidently, it was of the opinion that $50,000 was the best price available. By selling the note for $50,000 the bank would not be charged with income upon the recovery of a worthless debt (Cf. *Commissioner* v. *First National Bank of Stratford, supra*) and would avoid the uncertainties and difficulties of enforced collection. It is highly unlikely that a bank would intend to make a gift to one of its borrowers. Cf. *Noel* v. *Parrott*, (C. A. 4) 15 F. 2d 669, certiorari denied 273 U. S. 754. Most of the consideration for the purchase of the note was furnished by petitioner, rather than by Eleanor, the maker, and this in itself is a valid consideration for releasing the remaining indebtedness. 1 Williston on Contracts, sec. 125; Restatement, Contracts, sec. 421, cited with approval in *Brown* v. *Cowden Livestock Co.*, (C. A. 9) 187 F. 2d 1015, 1018.

We are unimpressed with the testimony of the president of the bank that he gave $50,000 to petitioner. He also testified that petitioner was not indebted to the bank on the note. Furthermore, petitioner testified that he had been informed that the bank was willing to sell the note to anyone for $50,000. We can only interpret the bank president's testimony as meaning that the bank was willing to sell the note at book value, and, if the transaction benefited petitioner, so much the better. We conclude, therefore, that the discharge of the note in 1946 did not constitute a gift from the bank to Eleanor, but resulted in her realization of ordinary income in the amount of $50,000. *Commissioner* v. *Jacobson, supra.*

*Decisions will be entered under Rule 50.*