Elsie W. FAROLL, Executor of the Estate of Barnett Faroll, deceased, Plaintiff-Appellee,

v.

John T. JARECKI, Collector of Internal Revenue, Defendant-Appellant.

No. 11542.

United States Court of Appeals Seventh Circuit.

March 15, 1956.

Lindley, Circuit Judge, dissented.

H. Brian Holland, Asst. Atty. Gen., Marvin Weinstein, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., Robert Tieken, U. S. Atty., Chicago, Ill., Lee A. Jackson, Stanley P. Wagman, Attys., Dept. of Justice, Washington, D. C., for appellant.

Sidney U. Hiken, Joseph H. Taylor, Benjamin M. Brodsky, Bernard Weisberg, Chicago, Ill., Gottlieb & Schwartz, Chicago, Ill., of counsel, for appellee.

Before FINNEGAN, LINDLEY and SCHNACKENBERG, Circuit Judges.

FINNEGAN, Circuit Judge.

A judgment of the District Court, in substance, grounded on a finding that commodity futures sold by the taxpayer, Barnett Faroll,[1] during the year 1943 constituted property held by him primarily for sale (and that sales were made) to customers in the ordinary course of his trade or business, is appealed by the defendant, Collector of Internal Revenue. After that finding, the district judge further concluded that those commodity futures were not "by express statutory definition, 'capital assets,'" citing § 117(a) (1), Internal Revenue Code of 1939,[2] as amended by § 115(b), Internal Revenue Act of 1941, c. 412, 55 Stat. 687, and § 151(a), Internal Revenue Act of 1942, c. 619, 56 Stat. 798. Consequently taxpayer's losses sustained in 1943 on these commodity future sales were not capital losses, according to the court below, and were not subject to the capital loss limitations appearing in § 117(d) (2), Internal Revenue Code of 1939, as amended by § 150 (c), Revenue Act of 1942. The losses, aggregating $136,421.59, were allowed

---

1. Barnett Faroll died on January 5, 1954. Elsie W. Faroll, his executor, was substituted as the plaintiff in this case. For convenience we refer to the plaintiff's side of the appeal interchangeably as the "taxpayer" or "plaintiff" or "Faroll."

2. "§ 117. Capital gains and losses—(a) Definitions.
"As used in this chapter—
"(1) Capital assets.

"The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * *
"(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *."

in full as an ordinary deduction from taxpayer's gross income under § 23(e), Internal Revenue Code of 1939. Taxpayer's claim of refund, $43,565.83 plus interest, for federal income taxes erroneously and illegally collected was allowed under the judgment brought here for review.

Stipulated facts underlie the memorandum, findings of fact and conclusions of law made and entered by the district judge. Because of Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A., it is necessary to underscore the prefatory portion of the stipulation:

> "\* \* \* it is expressly agreed that by the use herein of words and phrases such as 'traded in,' 'dealt in,' 'sold for his own account,' etc., the defendant does not concede that the commodity futures which the defendant sold in 1943 were, and the plaintiff does not concede that they were not, the decedent's stock in trade or property of a kind which should have been included in an inventory at the close of said year, or property held by him primarily for sale to customers in the ordinary course of his trade or business." [3]

With that caveat in the stipulation of facts, the status, taxwise, of commodity futures and taxpayer's activities were left open for judicial interpretation of the relevant Code provision, and we are not bound to an affirmance. Chandler v. Jarecki, 7 Cir., 1955, 226 F.2d 403.

This case is the converse of those familiar instances when taxpayers insist upon capital gain treatment for their transactions. Here, the defendant government seeks the capital asset status under the Code, and taxpayer resists. In this respect, as well as others, the appeal before us is unlike the taxpayer's claim for capital-asset treatment under § 117(a) of the Internal Revenue Code of 1939, in Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 76 S.Ct. 20, 24, on which the plaintiff, be-

fore us, places her chief reliance. But a more significant element of Faroll's case in contrast with Corn Products, can be shortly stated. "None of the taxpayer's (Faroll's) futures transactions referred to in this stipulation were hedges or entered into by him for the purpose of hedging; nor was the taxpayer a farmer, producer, miller, operator of a grain elevator, operator of a grain warehouse, or processor in any other manner in grains." [4] But this phase of the parties stipulation, before us, quickly cuts ground from under the Corn Products opinion as a closely analogous precedent. For there, Corn Products, futilely contended that its transactions "did not constitute 'true hedging.'" Such argument being necessary to implement the capital asset position asserted, by Corn Products, and, no doubt, because GCM 17322 draws a line of demarcation between speculative transactions in commodity futures and hedging transactions. Rejecting the assertions of Corn Products, Mr. Justice Clark, delivering the Court's opinion said,[5] *inter alia:* "The interpretation outlined in this memorandum has been consistently followed by the courts as well as the Commissioner. While it is true that this Court has not passed on its validity it has been well recognized for 20 years, and Congress has made no change in it though the Code has been re-enacted on three subsequent occasions. This bespeaks congressional approval. Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52. Furthermore, Congress has since specifically recognized the hedging exception here under consideration in the short sale rule of § 1233(a) of the 1954 Code, 26 U.S.C.A. § 1233(a). We believe that the statute clearly refutes the contention of Corn Products \* \* \*. To hold otherwise would permit those engaged in hedging transactions to transmute ordinary income into capital gain at will. \* \* \*" 1955, 350 U.S. 46, 53–54, 76

---

3. T.R. 14.

4. T.R. 17.

5. Footnotes of the Court are omitted in the passage we have quoted.

S.Ct. 20, 24. Consistent with the recitation already quoted from Faroll's stipulation, the district judge, in Faroll's case, repeated that non-hedging element in his memorandum and third finding of fact.

After close examination of the factual situation reported in the Corn Products [6] opinion supra, we think that case is not decisive of the one before us. Both the Tax Court and Court of Appeals found Corn Products' futures transactions "to be an *integral part of its business* designed to protect its manufacturing operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements." (Our emphasis.) The Supreme Court refused to disturb those findings and rejected, as being without merit, the theory sponsored by Corn Products that its futures were property entitled to § 117 treatment because as such, those futures activities of Corn Products were separate and apart from its manufacturing operation.

As we read that opinion, Corn Products was a manufacturer of products made from grain corn (it manufactures starch, syrup, sugar, and their by-products, feeds and oil) who purchased and acquired its raw materials (indispensable for its manufacturing operations) through commodity futures. The short of it is cogently stated by Mr. Justice Clark: " * * * it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation." 350 U.S. 46, 50, 76 S.Ct. 20, 23. Moreover, the Justice referred to specific evidence elicited from officers of Corn Products who testified that in entering the market the company was " 'trying to protect a part of (its) man-

ufacturing costs' * * * to fill an actual 'need for the quantity of corn (bought) * * * in order to cover * * * what (products) we expected to market over a period of fifteen or eighteen months.' " 350 U.S. 46, 51, 76 S.Ct. 20, 23. Justice Clark characterized that testimony as "not the talk of the capital investor but of the far-sighted manufacturer." Ibid. It was, accordingly, held that the futures did not constitute capital assets in Corn Products' hands. We think this is important because the Corn Products case must be read as applicable to the core business of manufacturing in which that taxpayer engaged. That and the hedging aspect, we think, is what controlled the classification of the futures there involved. The Supreme Court declined to separate out the element of commodity futures. But there is no such indistinguishable fusion of activities present in the appeal we are considering.

After making some particular findings of fact, the district judge added this one: " 5 incorporated herein by specific reference thereto *are all of those facts* not hereinabove set forth which are contained in the written stipulation of facts and in the exhibits attached thereto." For that reason we will first report the salient findings of fact, made below, then implement them with pertinent passages from the stipulation:

*Findings:*

"Throughout 1943 and for many years both prior and subsequent thereto the Taxpayer was engaged in two distinct and separate businesses, as follows: (a) He was a general partner in a brokerage firm and (b) he bought and sold commodity futures, chiefly wheat, corn, oats, barley, rye and soybeans, on the floor of the Board of Trade of

---

**6.** The grant of certiorari was limited to two questions, one of which, relevant here was: " '1. Are transactions in commodity futures, which, are not "true hedges" capital asset transactions and thus subject to the limitations of Section 117 of the Internal Revenue Code of 1939, or do the resulting gains and

losses from such transactions give rise to ordinary income and ordinary deductions?' " 350 U.S. 46 at page 47, 76 S. Ct. 20, 21.

But it is to be remembered that the court found hedging was present and within the exclusion of § 117(a).

the City of Chicago, of which he was in 1943 and thereafter, and since 1907 had been, a member. *His futures transactions were on his own behalf and not for the account of the partnership of which he was a member or for any of the customers of said partnership.* Each week-day during 1943 the Chicago Board of Trade (hereinafter sometimes called the 'Exchange') opened at 9:30 A. M. and closed at 2 P. M. On Saturdays it was open from 9:30 A. M. to noon. Except for vacations, illnesses and trips out of the city, the Taxpayer was personally present on the floor of the Exchange on each day the Exchange was open, during all of the hours it was open, for the sole purpose of buying and selling commodity futures on his own behalf. When not on the floor of the Exchange, he devoted his remaining working time to research and other activities related to his tradings or dealings on the Exchange except for occasional and brief consultations with the partners and employees of his partnership concerning the brokerage business of that firm. Such consultations were limited to important managerial questions and at no time during 1943 or at any other time material hereto did the Taxpayer devote any substantial amount of time to the operations of the partnership of which he was a member. The *Taxpayer did not buy or sell commodity futures as hedges nor was the Taxpayer a farmer, producer, miller, operator of a grain elevator or warehouse, or a processor in any other manner of grains.* The Taxpayer was personally present on the floor of the Exchange, buying and selling commodity futures, as aforesaid, not less than 248 of the days on which the Exchange was open for business during the year 1943.

"During 1943 the Taxpayer, in more than 10,000 separate transac-tions, personally bought and sold as the principal, on his own account, commodity futures involving almost 81,000,000 bushels of grain at prices amounting, in the aggregate, to more than $84,000,000. He averaged, at a minimum, 41 separate transactions, over 360,000 bushels of grain and over $340,000 of commitments per day. The only persons permitted to buy and sell commodity futures on the floor of the Exchange in 1943 and both prior and subsequent thereto were members thereof. Therefore, the Taxpayer made all of his commodity futures purchases from other members of the Exchange and he made all of his sales of commodity futures to other members of the Exchange."

*Stipulation:*

"The Board of Trade of the City of Chicago is an incorporated association which (a) provides a place, in Chicago, in which grains (as well as certain other commodities and products) are bought and sold, and (b) furnishes and enforces rules and regulations, for the making of such purchases and sales. Transactions on the Board of Trade consist of (a) cash transactions and (b) contracts for future delivery, called 'futures'. Cash grain trading takes place at long rows of tables lining one wall of the trading floor. It involves the purchases and sales, for immediate delivery, of grains already in or shortly to arrive in Chicago. Futures are contracts to deliver or to receive a specified quantity of a particular grain during a specified period of time in the future, which contracts, under the provisions of the Commodity Exchange Act and the regulations duly promulgated thereunder, are made and executed according to the rules and regulations of the Board of Trade. All futures bought and sold on the floor of the Board of Trade are settled through a cen[t]ral agency known as the Board of Trade

Clearing Corporation. The transactions on the Chicago Board of Trade for future delivery are made in a structure called a 'pit' which is built upon the trading floor. This pit consists of a number of steps or stairs arranged in such a way that the members of the Board of Trade can stand upon them facing one another in a circle. There are individual pits for each of the principal grains dealt in. At these pits several hundred men gather each morning, awaiting the stroke of a bell, which opens the trading session for that day. Because individual voices are sometimes lost in general shouting, a system of trading by hand signs is used. As soon as a futures transaction is made it is recorded on cards carried by the two parties to the transaction, each party's card bearing his own name at the top. One side of the card is printed in blue and is for recording purchases; the other side is printed in red, and is for sales. The information entered on each card includes, in abbreviated form, the quantity and kind of grain bought or sold, the delivery month, the price at which the trade was made, and the name of the party from whom it was bought or to whom it was sold. Thus, the two cards record a contract between the parties thereto, and such contracts are binding to the same extent as though a formal agreement had been drawn up, signed and attested by witnesses. Only members of the Chicago Board of Trade are permitted to buy and sell either cash grains or futures on the floor of the Exchange. Therefore all purchases, whether of cash grains or of futures, are made by one member from another member, and all sales by one member to another member. However, each member of the Board of Trade may buy and sell either for his own account or as an agent or broker for a non-member.

"All of the foregoing obtained throughout the year 1943 and for many years prior thereto. * * * [stipulation concerning the Charter of the Board of Trade, its Rules and Regulations applicable to 1943 and contained in an incorporated Exhibit.] * * *

"The taxpayer was not at any time during the year 1943 a member of the Board of Trade Clearing Corporation. The partnership of Faroll Bros. was a member of said Board of Trade Clearing Corporation during the year 1943; the taxpayer had authority from said partnership, in which he had a seventy per cent (70%) interest as a general partner, to clear all trades made by him on his own account, as aforesaid, on the floor of the Exchange through said partnership during 1943; said permission was in compliance with the rules of the Board of Trade and the by-laws of the Board of Trade Clearing Corporation; and the taxpayer did in fact clear all of his trades during the year 1943 through said partnership.

"All of the taxpayer's dealings on the Board of Trade during the year 1943 were made in compliance with the Rules and Regulations of the Board of Trade and as otherwise described herein. * * * *"

With the Corn Products opinion as a springboard, Faroll insists his faithful, virtually undivided, efforts devoted to commodity futures transactions constitute § 117(a) (1) "business" during which he held property (commodity futures) for sale to customers in the ordinary course of his trade or business. Here, this taxpayer is trying to fit the exchanging of cards, resulting in contracts between Board of Trade members, acting in response to price fluctuations, into the statutory words of exclusion. He can do so only by emptying § 117(a) (1) of its contents. This is apparent for several reasons. Reference to Hoffman, Future Trading Upon Organized Commodity Markets In The

United States, at page 118, cited as an authority by the Supreme Court in its first marginal note to Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 47, 76 S.Ct. 20, shows that the expanded definition of a commodity future, according to Hoffman is: " * * * an agreement to buy or sell, in accordance with law and the rules of an exchange, a definite quantity of a commodity at an agreed price at a future date, being entered into for the purpose of speculating on or hedging against price changes, and being usually closed out later by another offsetting future trade." We think it clear from the record before us that absent hedging, Faroll was a trader. Commissioner of Internal Revenue v. Covington, 5 Cir., 1941, 120 F.2d 768, 771. It should be noticed that fragments of the foregoing definition appear among the facts stipulated.

From the stipulated activities and description of the Board of Trade's operations, we would have to ignore the realities of the market place, to hold otherwise than that Faroll's losses resulted from declines and advances in prices in the market, Chicago Board of Trade, where he daily bought and sold commodity futures on his own behalf.[7] To say all businesses contain an element of speculation is not an answer here. Life itself is a speculation. We also think the inter-member[8] transactions in commodity futures operating in the "pit" are not, on these facts, sales to customers within the meaning of § 117(a) (1). Even capital assets, uncontroverted in such classification, may be sold to a customer or customers without losing preferential treatment under the Code. In-

deed, frequently, that is the tax-wise juncture of realization to the holder of such assets.

We find no evidence, in the stipulation and exhibits establishing that Faroll intended making or accepting delivery of a commodity upon the expiration of a future. See e. g. Board of Trade of City of Chicago v. Olsen, 1923, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839; United States v. Chinook Investment Co., 9 Cir., 1943, 136 F.2d 984, from which this taxpayer derives much comfort, is estranged from the facts at bar. Chinook, an Oregon corporation, bought and sold securities and generally solicited customers to buy and sell—"The transactions were not on margin, but for cash, and there was a capital turn-over about once each year." Ibid. If we follow the Ninth Circuit's suggestion of looking to the status of the assets rather than the status of Faroll, as he would have us, then we point out that Chinook's securities were held for sale to customers under the trial court's findings. Moreover, it was also found that the securities were not held by Chinook for investment or speculation. But such reasoning is fallacious since an asset can be held for speculative purposes and for customers, i. e., to speculate with other customers. We also note that statutes, regulations, and case-law concerning stock brokers, dealers, speculators, and investors have changed since the Chinook case.

It is evident, and undisputed, that Faroll's transactions were not in the commodity itself. This significant aspect is also brought into further sharp relief by Hoffman's statement: "Future contracts should * * * be thought of

---

7. See e. g. the Commodity Exchange Act, 42 Stat. 998, 49 Stat. 1491, as amended for an overview of legislative declaration of policy.

8. In taxpayer's brief at page 10, counsel stated:
   "The taxpayer sold to persons who 'regularly, customarily, and repeatedly' made purchases *from* him, *viz.* other members of the Board of Trade. He sold

to them and only to them. *They were his customers if only because under the rules of the Board of Trade and the Commodity Exchange Act he could not sell his commodity futures to any one else.* See Board of Trade Rule 259 Pl.E.G. p. 267; 7 U.S.C.A. secs. 2, 6, 6e and 6h * * *." (The word *"viz."* is italicized by plaintiff, all other emphasis has been added.)

as *rights* to the commodity rather than the commodity itself and in dealing in futures one is dealing not in the actual commodity but in *claims* on or *contracts* for the commodity." Hoffman, Future Trading 111 (1932). We are aware that Mr. Justice Holmes, speaking for the majority in Board of Trade of City of Chicago v. Christie Grain & Stock Co., 1905, 198 U.S. 236, 250, 25 S.Ct. 637, 639, 49 L.Ed. 1031, where the legality of commodity futures traders was in issue, said: "A set-off is, in legal effect, a delivery. We speak only of the contracts made in the pits, because in them the members are principals." Here our concern is not with legality of Faroll's transactions but rather the relations which commodity futures contracts bear to transactions in the actual commodity. Christie describes some of the activities at the Board of Trade, federal income tax law was not there involved.

Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 76 S.Ct. 20, seems to enlarge the scope of the exclusionary clause in § 117 in policy fashion. For the Court had already pointed out in its opinion: "Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section [§ 117(a)]. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business." 1955, 350 U.S. 46, 51–52, 76 S.Ct. 20, 24. Yet, despite the reflection of Congressional intent described in Corn Products we think that the opinion is limited to hedging transactions. At least we are not persuaded that the decision encompasses Faroll's assumption of risk in dealing in commodity futures for the purpose of profiting from uncertain fluctuations in price. Just as any other possessor of a capital asset, Faroll owned property (here a claim or contract right), but these commodity futures were held by him primarily for price fluctuations— the buying and selling followed.

The judgment appealed is reversed and remanded with directions to enter a judgment in favor of the defendant.

Reversed and Remanded.

LINDLEY, Circuit Judge (dissenting).

I am sorry that, after a careful review of the evidence, I feel impelled to dissent from the decision that the judgment be reversed. Without reiteration or enlargement, I think that the district court properly analyzed the situation and correctly held that the commodity futures which the taxpayer sold are not to be distinguished from actual commodities; that these futures were held by the taxpayer primarily for sale to customers, and that the sales were made in the ordinary course of the taxpayer's trade or business.

Accordingly, I would affirm the judgment.