Henry I. Seroussi v. Commissioner.
Seroussi v. Commissioner
Docket No. 93554.
United States Tax Court
T.C. Memo 1963-233; 1963 Tax Ct. Memo LEXIS 109; 22 T.C.M. (CCH) 1186; T.C.M. (RIA) 63233; August 29, 1963
Henry I. Seroussi, pro se, 112 E. 88th St., New York, N. Y. Rudolph J. Korbel, for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income tax for 1956 and 1957 in the respective amounts of $10,927.45 and $3,366.48 and of $583.06 for 1956 in addition to tax under section 6651(a), I.R.C. 1954. Both parties having made concessions, the sole remaining issue is whether petitioner's losses in commodity futures contracts were deductible in full or only as capital losses *110 under section 1211(b), I.R.C. 1954. Findings of Fact The facts contained in the stipulation and the exhibits thereto are hereby found accordingly. The stipulation reads as follows: 1. Petitioner is an individual residing at 124 East Hill Road, Colonia, New Jersey. The joint income tax returns for the years 1956 and 1957 of petitioner and his wife, Berthie Seroussi, were filed with the District Director of Internal Revenue in the Brooklyn District, New York. * * * 2. The notice of deficiency was mailed to petitioners on or about April 24, 1961. 3. Petitioner, prior to becoming an American citizen in 1948, was a British subject residing in Sudan. He came to the United States in 1946. 4. Petitioner and his wife Berthie Seroussi were married in 1946. They were divorced in 1958. Berthie Seroussi died in 1961. 5. Berthie Seroussi was a graduate of Columbia University in New York City. She received her Masters Degree in 1946 and did work on her doctorate degree. She majored in history, art, languages, ancient and foreign cultures. 6. Petitioner, prior to his arrival in the United States in 1946, had been engaged in the import and export commodity trade. *111 7. During the years 1946 through 1950, petitioner was president of an import and export company known as Seroussi Trading Co., Inc. Berthie Seroussi was treasurer of said company. Both parties contributed capital to the said company. The trading company was engaged in the business of importing and exporting commodities, such as, raw cotton, gum Arabic, hides, skins, manufactured goods, machinery, textiles, chemicals, etc. The Seroussi Trading Company, Inc., was dissolved in 1950. 8. The activities of the Seroussi Trading Company, Inc., were essentially the same as those performed by petitioner prior to 1946. 9. Petitioner registered with the New York Stock Exchange in 1950 and solicited business in stock, bonds and commodities for various Wall Street firms for the period 1950 through 1954. 10. In 1956, upon the death of her father, Berthie Seroussi inherited an estate of approximately $220,000.00. 11. In 1956, petitioner and his wife Berthie, set up a company called Norin Coffee Company. 12. The Norin Coffee Company was set up as a joint venture with a third party to import coffee from Madigascar and hedge on the futures market. It was attempting to buy African coffee and *112 sell Brazilian coffee futures. As a result of these activities, money was lost on African coffee and on the early sale of Brazilian coffee futures. The joint venture was terminated in 1956. 13. Petitioner concedes the correctness of the Commissioner's determination for the taxable year 1956 as set forth in the statutory notice of deficiency except for the disallowance of $8,996.75. 14. During the taxable year 1956 there is indicated on petitioner's and Berthie Seroussi's joint income tax return dealings in approximately 200 to 300 separate and distinct futures contracts in various commodities, of which five deliveries were accepted of the various commodities. 15. The funds used in the future contracts, supra, paragraph 14, were those of petitioner's wife, Berthie Seroussi. Petitioner counseled and advised with regard to all of said transactions. 16. During the years 1954 through the early part of 1957, petitioner was employed as a registered representative of the brokerage firm of Fahnstock & Co. in New York City, representing customers in their dealings in commodity futures and stock securities. 17. In February of 1957 petitioner's arrangement with Fahnstock & Co. was terminated *113 and he rented an office at 82 Beaver Street in New York City and directed all his activities to the commodity market. 18. During the year 1957 petitioner's activities in commodity futures were transactions on his own behalf or that of his wife Berthie Seroussi and not for the account of any other person. 19. During the year 1957 the petitioner became a member of the following commodity exchanges and trade associations: a. Board of Trade of the City of Chicago b. New York Cotton Exchange
c. New York Coffee and Sugar Exchange d. New York Commodity Exchange 20. During the taxable years 1956 and 1957 the petitioner did not buy or sell commodity futures as hedges, nor was he a farmer, producer, miller, operator of a grain elevator or warehouse, or a processor. 21. The Board of Trade of the City of Chicago is an incorporated association which (a) provides a place, in Chicago, in which grains (as well as certain other commodities and products) are bought and sold, and (b) furnishes and enforces rules and regulations, for the making of such purchases and sales. Transactions on the Board of Trade consist of (a) cash transactions and (b) contracts for future delivery, called *114 "futures." Cash grain trading takes place at long rows of tables lining one wall of the trading floor. It involves the purchases and sales, for immediate delivery, of grains already in or shortly to arrive in Chicago. Futures are contracts to deliver or to receive a specified quantity of a particular grain during a specified period of time in the future, which contracts, under the provisions of the Commodity Exchange Act and the regulations duly promulgated thereunder, are made and executed according to the rules and regulations of the Board of Trade. All futures bought and sold on the floor of the Board of Trade are settled through a central agency known as the Board of Trade Clearing Corporation. The transactions on the Chicago Board of Trade for future delivery are made in a structure called a "pit" which is built upon the trading floor. This pit consists of a number of steps or stairs arranged in such a way that the members of the Board of Trade can stand upon them facing one another in a circle. There are individual pits for each of the principal grains dealt in. At these pits several hundred men gather each morning, awaiting the stroke of a bell, which opens the trading session *115 for that day. Because individual voices are sometimes lost in general shouting, a system of trading by hand signs is used. As soon as a futures transaction is made it is recorded on cards carried by the two parties to the transaction, each party's card bearing his own name at the top. One side of the card is printed in blue and is for recording purchases; the other side is printed in red, and is for sales. The information entered on each card includes, in abbreviated form, the quantity and kind of grain bought or sold, the delivery month, the price at which the trade was made, and the name of the party from whom it was bought or to whom it was sold. Thus, the two cards record a contract between the parties thereto, and such contracts are binding to the same extent as though a formal agreement had been drawn up, signed and attested by witnesses. Only members of the Chicago Board of Trade are permitted to buy and sell either cash grains or futures on the floor of the Exchange. Therefore all purchases, whether of cash grains or of futures, are made by one member from another member, and all sales by one member to another member. However, each member of the Board of Trade may buy and sell *116 either for his own account or as an agent or broker for a non-member. All of the foregoing occurred throughout the years 1956 and 1957 and for many years prior thereto. 22. The manner of operation and the rules governing the other commodity exchanges listed in paragraph 19, supra, are essentially identical to those of the Chicago Board of Exchange set forth in paragraph 21, supra, for the years 1956 and 1957 as well as preceding and subsequent years. 23. Petitioner was not a member of the Board of Trade Clearing Corporation, the organization which acts as a clearinghouse for trading conducted on the Chicago Board of Trade. Petitioner cleared his trades through various clearinghouse members. 24. When a futures delivery contract is cleared through the clearinghouse, the clearinghouse is deemed substituted as buyer to the seller, and thereupon the clearinghouse has all the rights and is subject to all of the liabilities of the original parties with respect to such contract. If a member buys and sells the same commodity for delivery in the same contract month, upon clearance through the clearinghouse, the purchases and sales are required to be offset to the extent of their equality *117 and the member is deemed a buyer from the clearinghouse to the extent that his purchases exceed his sales, or a seller to the extent that his sales exceed his purchases. A trader's position is closed either by subsequent purchases or sales, or by delivery of the commodity itself. All other exchanges listed above in paragraph 19, supra, had their own clearinghouses and operated similar to the Chicago Board of Trade Clearing Corporation as set forth heretofore. 25. Petitioner traded in hundreds of thousands of bushels, pounds and bales of various commodities in round lot quantities, on the Chicago Board of Trade commodity futures market, and the other exchanges listed in paragraph 19, supra, during the year 1957. Such trading consisted of thousands of trades in large quantities. Petitioner took less than five deliveries of various commodities in the year 1957. 26. At the close of each of the taxable years 1956 and 1957 the petitioner had no inventory of any actual commodities. 27. Of the amount of $10,000.00 which was disallowed as item (d) in the statutory notice of deficiency for the taxable year 1957, petitioner is entitled to a deduction in the amount of $7,451.28. 28. It *118 is expressly agreed that by the use herein of words and phrases such as "traded in," "dealt in," "sold for his own account," etc., the respondent does not concede that the commodity futures which petitioner sold in 1957 were, and the petitioner does not concede that they were not, the petitioner's stock in trade or property of a kind which should have been included in an inventory at the close of said year, or property held by him primarily for sale to customers in the ordinary course of his trade or business. In addition, we find the following from the evidence: When petitioner took delivery of an actual commodity he would sell the commodity on the floor of the various commodity exchanges in the same manner that he sold futures contracts. Petitioner did not sell the actual commodities delivered to him to anyone other than to the members of the various commodity exchanges through the exchanges' facilities. The actuals delivered to the petitioner consisted of various kinds of commodities, such as, cotton, soy beans, etc. Norin Coffee Company during its existence in the year 1956 dealt in coffee futures contracts. During the early part of 1957, petitioner had unrealized profits *119 in commodities of over $800,000 on an original capital investment of approximately $250,000. The commodity futures contracts involved here were contracts accessible and available to other members of the various exchanges, and the petitioner, as a seller, would depend on such circumstances as the rise in value or an advantageous purchase to enable him to sell out at a price in excess of cost. Petitioner's obligations as a member of the various commodity exchanges were essentially the same as those of any other party not a member of the exchanges in connection with the purchase and sale of commodity futures contracts. Petitioner during the year 1957 was present on the floor of one or another of the various commodity exchanges during the entire time the exchanges were doing business. The commodity futures held by petitioner were capital assets. Opinion Petitioner did not, as in Corn Products Co. v. Commissioner, 350 U.S. 46 (1955), conduct his trading in commodity futures as an integral part of some other business operation. Craig M. Smith, 33 T.C. 465, 483 (1959), affirmed this issue 313 F. 2d 724 (C.A. 8, 1963); Commissioner v. Covington, 120 F. 2d 768 *120 (C.A. 5, 1941), affirming this issue 42 B.T.A. 601 (1940), certiorari denied 315 U.S. 822; Flora v. United States, 142 F. Supp. 602 (D. Wyo. 1956), reversed on another issue 357 U.S. 63 (1958), reversal reaffirmed on rehearing 362 U.S. 145 (1960); cf. Albert Kurtin, 26 T.C. 958 (1956). These dealings were independent speculative transactions, L. M. Muldrow, 38 T.C. 907 (1962); Faroll v. Jarecki, 231 F.2d 281 (C.A. 7, 1956), certiorari denied 352 U.S. 830, and were no more subject to ordinary income treatment than would have been the case had they been purchases, sales, or short sales of securities. George R. Kemon, 16 T.C. 1026 (1951). While, of course, petitioner hoped to make a profit by selling the contracts at more, or delivering the commodities at less, than his cost, the futures contracts were not his stock in trade to be sold at a mark-up as in the case of a dealer, George R. Kemon, supra; [1] cf. Helvering v. Fried, 299 U.S. 175 (1936), nor inventory items upon which gain or loss must be measured by accrual at the end *121 of each taxable year. [2]Schafer v. Helvering, 299 U.S. 171 (1936); cf. Estate of Harry E. R. Hall, 29 B.T.A. 1255 (1934), affirmed sub nom. Commissioner v. Stevens, 78 F. 2d 713 (C.A. 2, 1935).
*122 Petitioner himself did not treat them this way. Had he done so, his method of accounting would have had to be accrual, which it apparently was not. Stanley C. Warrick, 20 B.T.A. 220 (1930); Rosner v. W.C.P.A.B., 17 T.C. 445 (1951); see also James W. England, Jr., 34 T.C. 617 (1960). And, "[the] fact that [petitioner] did accept a few commodities and re-sold them to individuals other than fellow brokers does not operate to change the tax treatment of the losses incurred." Flora v. United States, supra at 606. Petitioner, it is true, was in receipt of ordinary income from commissions earned as a member of exchanges on transactions carried out for others. But this occupation was totally unconnected with his independent futures speculations.[3] Nor was he entitled to set off the commissions he paid as a trader against those he earned as an exchange member. The former were capital items increasing the loss or reducing the gain on the purchases and sales of his futures contracts. Helvering v. Winmill, 305 U.S. 79 (1938); Spreckels v. Commissioner, 315 U.S. 626 (1942). *123 We conclude that respondent correctly treated the results of petitioner's commodities transactions as capital losses in the computation of which the commissions paid by him are to be included. To take account of conceded items, Decision will be entered under Rule 50. Footnotes
1. * * * [A] speculator trading on his own account could not claim the securities he sold were other than capital assets. The theory of the amendment was that those who sell securities on an exchange have no "customers" and for that reason the property held by such taxpayers is not within the above quoted exclusionary clause. * * * Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors, as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. [George R. Kemon, 16 T.C. 1026, 1032-1033↩ (1951).] 2. * * * These rights are intangible property which may appreciate or depreciate in value. They are capital assets held by the taxpayer (whether or not connected with his trade or business), but, unless they are hedges (which are in a class by themselves), they cannot be regarded as stock in trade or other property of a kind which would properly be included in the inventories of the taxpayer if on hand at the close of the taxable year. Neither are they property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. [Commissioner v. Covington, 120 F. 2d 768, 771, concurring opinion (C.A. 5, 1941), affirming this issue 42 B.T.A. 601 (1940), certiorari denied 315 U.S. 822↩.]
3. "Throughout 1943 and for many years both prior and subsequent thereto the Taxpayer was engaged in two distinct and separate businesses, as follows: (a) He was a general partner in a brokerage firm and (b) he bought and sold commodity futures, chiefly wheat, corn, oats, barley, rye and soybeans, on the floor of the Board of Trade of the City of Chicago, of which he was in 1943 and thereafter and since 1907 had been, a member. His futures transactions were on his own behalf and not for the account of the partnership of which he was a member or for any of the customers of said partnership." [Faroll v. Jarecki, 231 F. 2d 281, 284-285 (C.A. 7, 1956), quoting from opinion below, certiorari denied 352 U.S. 830↩.]