EUGENE C. HUEBSCHMAN AND EDNA M. HUEBSCHMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Huebschman v. Commissioner
Docket No. 283-79.
United States Tax Court
T.C. Memo 1980-537; 1980 Tax Ct. Memo LEXIS 47; 41 T.C.M. (CCH) 474; T.C.M. (RIA) 80537; December 4, 1980
*47 Petitioner bought and sold substantial amounts of stocks and bonds during the years in issue. Held, petitioner was not a dealer in securities; therefore, stocks and bonds are capital assets in the hands of the petitioner within the meaning of sec. 1221, I.R.C. of 1954. James F. Conley, for the petitioners. Vallie C. Brooks, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT *48 AND OPINION STERRETT, Judge: By letter dated December 22, 1978, respondent determined deficiencies in petitioners' income taxes and additions to tax under section 6653(a), I.R.C. of 1954, as follows: Year
Deficiency
I.R.C. Sec. 6653(a)
1974
$ 32,816.95
$ 1,640.84
1975
20,155.56
1,007.77
1976
21,038.75
1,051.93
After concessions the issues remaining for our consideration are: (1) whether petitioner Dr. Huebschman was in the trade or business of selling securities; (2) whether petitioners are liable under section 6653(a) for additions to tax; and (3) whether petitioners are entitled to recover attorney's fees. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. Dr. and Mrs. Huebschman are husband and wife and at the time they filed their petition herein resided in Tullahoma, Tennessee. For each of the years 1971 through 1978, Dr. and Mrs. Huebschman filed a joint Federal income tax return on the basis of the cash receipts and disbursement method of accounting *49 with the Director, Internal Revenue Service Center, at Memphis, Tennessee. During the years in issue, Dr. Huebschman (herein after referred to as petitioner) was a professor of engineering at the University of Tennessee's Space Institute (UTSI) in Tullahoma, Tennessee, which is a graduate school for engineering, mathematics, physics and continuing education in the aerospace sciences. In 1971, petitioner went from full-time professor status to part-time professor status for UTSI, with 40 percent of his time devoted to teaching a graduate course in student monitoring and 20 percent of his time devoted to research contracts or other revenue producing projects for the Institute. In about 1950, petitioner began to buy and sell securities through a broker from the various stock exchanges and over-the-counter market. Originally, petitioner made approximately three or four security transactions a day, five days a week. As he began to earn a larger salary, his security transactions increased in the late 1960's to twenty to thirty stock transactions a day. From 1958 through 1970, petitioner undertook his security transactions through Mr. Robert Reed, who was employed with a brokerage *50 firm in Cocoa Beach, Florida. By the early 1970's, petitioner was having telephone conversations with Mr. Reed four to six times daily regarding the purchase and sale of various securities. During the late 1960's and early 1970's, over 50 percent of Mr. Reed's time was spent consummating security transactions for the petitioner. In approximately 1970, petitioner began to concentrate most of his security transactions on four or five corporations involved in "high technology" and his field of study. Petitioner hoped to become a member of the board of directors of the corporations, to obtain some income as a consultant, and to sell a block of securities at an otherwise higher price. At the same time, petitioner's security transactions with respect to bonds increased to the point where he had purchased in excess of $ 1,500,000 worth of bonds. Petitioner purchased such bonds on a margin account by putting up 30 percent of the purchase price. Petitioner also purchased stocks on a margin account which required him to put up 50 percent of the purchase price of the stock with the stock held as collateral for the purchase. Most of petitioner's bond transactions were in what his broker *51 considered a "thin market." With respect to some of the bonds petitioner requested his broker to send the interest payable on the bonds directly to him, and with others the interest was retained and credited to his account with the broker. During the years in issue, petitioner made all of his purchases and sales of securities through Reynolds Securities, Inc., a major stock exhange firm, at their offices in Cocoa Beach, Florida or Huntsville, Alabama. Petitioner had considered making purchases and sales directly but the bookkeeping and paperwork involved plus financing problems made such trading unattractive. During the years in issue, all the security transactions that petitioner made through his broker were for petitioner's own account and based on his own research and opinion with respect to what would be profitable transaction. Petitioner maintained no records of his security transactions other than that supplied to him by Reynolds Securities, Inc., during the years involved. Petitioner did not maintain a separate bank account for his security transactions. Such transactions were handled through his personal checking account. Petitioner did not have a license to operate *52 as a security dealer, nor did he advertise himself as a security dealer or hire any salesmen for the purpose of dealing in securities. In the acquisition of some securities, petitioner hoped to acquire large blocks of stocks or bonds which he could sell directly to the issuing corporation at a profit. On one occasion in 1975, petitioner negotiated a sale of a block of approximately 125 Altec Corporation bonds back to the corporation. After negotiating the sale of the bonds to Altec, petitioner instructed his broker to consummate the sale and deliver the bonds to Altec. In 1973, petitioner had total losses of $ 219,811.50 from the sale of stocks and bonds held for less than six months or which became worthless in his hands within six months after acquisition. In the same year, petitioner realized gains in the total amount of $ 71,560.24 from the sale of Jones and Laughlin bonds that he had held for more than a period of six months. As a result, petitioner's net losses from securities transactions totaled $ 148,251.26 in 1973. The losses from securities held for less than six months by petitioner in 1973 were as follows: Arlan's Department Store bonds
($ 111,532.27)
Rikers Maxson Corp. bonds
(90,219.51)
Others
(18,059.72)
($ 219,811.50)
*53 On his joint return for 1973, petitioner reported the losses from bonds set forth above as short-term losses and the gain from the sale of the Jones and Laughlin bonds as long-term profit. He deducted one-half of the long-term profit from the losses from the bonds to arrive at a loss of $ 186,331.38 from which he deducted interest and dividends of $ 56,741.78 to arrive at a "stock loss carried forward" of $ 129,589.60. For the years 1974, 1975 and 1976 petitioner, on schedules attached to his returns, listed his business activities for each of the three years as farming, stock-trading, consulting and bulldozing. Petitioner did not submit a schedule with respect to his income and expenses from any of such activities. In 1975 and 1976 petitioner filed his income tax return on a Form 1040A. Petitioner did not list his interest income and dividends on the appropriate lines on the Form 1040A. Petitioner did not maintain separate banking accounts nor records for any of his different businesses. It is nearly impossible to determine from any of the returns filed by the petitioner his income and expenses in any intelligible manner. OPINION The primary issue presented is whether *54 the bonds, in the hands of the petitioner, are a capital asset within the meaning of section 1221, I.R.C. of 1954. The stakes are clear: if the bonds are a capital then petitioner's loss is a capital loss subject to the limitations of section 1211; if the bonds were not a capital asset then the loss from the sale would be an ordinary loss. Capital asset is defined in part as property held by the taxpayer but excluding property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Thus, the bonds are a capital asset in the hands of the petitioner unless he is a dealer (i.e., in the trade or business of selling securities). Respondent contends that petitioner was a trader or investor and not a dealer. If he is a trader or investor, the bonds are a capital asset and his loss is a capital loss subject to the limitations of section 1211. Whether an individual is a dealer or a trader is a question of fact. Kemon v. Commissioner, 16 T.C. 1026, *55 (1951). In Kemon, this Court distinguished a dealer from a trader as follows: Whether or not securities are held primarily for sale to customers in the ordinary course of business is a question of fact, Stern Brothers & Co.,16 T.C. 295, in which the crucial phrase is "to customers." This phrase and the word "ordinary" were added to the definition of capital assets by Senate Amendment No. 66 in the Revenue Act of 1934 so that a speculator trading on his own account could not claim the securities he sold were other than capital assets. The theory of the amendment was that those who sell securities on an exchange have no "customers" and for that reason the property held by such taxpayers is not within the above quoted exclusionary clause. [Cits. omitted] In determining whether a seller of securities sells to "customers," the merchant analogy has been employed. [Cits. omitted] Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because *56 of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. * * * Such sellers are known as "dealers." Contrasted to "dealers" are those sellers of securities who perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the other and the seller performs no services that need be compensated for by a mark-up of the price of the securities he sells. The sellers depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost. Such sellers are known as "traders." [16 T.C. at 1032-1033.] The facts in the instant case clearly demonstrate that the petitioner was a trader and not a dealer. All of the transactions involved were done on behalf of petitioner's private account. Petitioner had no customers. All of his transactions were handled through a broker. Faroll v. Jarecki,231 F.2d 281, 287 (7th Cir. 1956), *57 cert. denied 352 U.S. 830 (1956). Further, petitioner was not licensed to sell securities nor did he have a seat on any of the exchanges. See Mirro-Dynamics Corporation v. United States,374 F.2d 14 (9th Cir. 1967), cert. denied 389 U.S. 896 (1967). Petitioner contends that the volume in which he traded, the amount of the securities held at any one time ($ 1.5 million) and the fact that he "created markets" for the bonds establishes that he was a dealer and not a trader. The law is well established that the proper classification of a loss in question does not depend upon the number of transactions, the amount of money involved, or the degree of trading activity. See Adnee v. Commissioner,41 T.C. 40, 42 (1963). While the large number of transactions and amount involved are factors in determining whether petitioner was a dealer, other inconsistencies prevent us from so finding. Petitioner had treated previous years' gains as capital gains. In 1973 petitioner had both gains and losses, yet he treated the gains as long-term capital *58 gains and the losses as ordinary. If a taxpayer seeks to be both a trader and a dealer then he must keep adequate records which segregate those stocks and bonds which are held in the capacity of a trader and those which are held in the capacity of a dealer. Petitioner kept no such records. In addition, the fact that petitioner purchased the stocks and bonds on margin convinces us that the profit petitioner sought was to be made on the fluctuation of the market and not remuneration for his labors. Hence we find the bonds were capital assets in the hands of the petitioner. The petitioner has the burden of proof with respect to the additions to tax under section 6653(a). Rule 142, Tax Court Rules of Practice and Procedure.Petitioner contends that he cannot be found liable for the negligence penalty because of his treatment of the bonds as an ordinary loss instead of as a capital loss. We need not consider petitioner's treatment of the loss from the bond sales in finding him liable for the additions *59 to tax. The manner in which petitioner filed his returns clearly demonstrates an intentional disregard for the rules and regulations of the Internal Revenue Code. For instance, petitioner did not submit a schedule with respect to his income expenses from any of his alleged businesses. In the years 1975 and 1976 petitioner filed his income tax returns on a Form 1040A. The so-called short form is to be used only when a taxpayer's sources of income are from wages, interest and dividends, and then only if the latter two items do not exceed $ 400. See section 1.6012-1(a)(7), Income Tax Regs. Further, even when filing on the Forms 1040A, petitioner failed to report his interest income and dividends on the lines called for in the return. Petitioner failed to maintain separate books of accounting with respect to his farming, stock-trading, consulting, and bulldozing activities. In short, the manner in which petitioner filed his returns and kept his books do not provide sufficient information upon which the respondent could verify his income and expenses. In light of petitioner's educational background and financial acumen, we find petitioner's manner of *60 filing his tax returns was clearly negligent. We sustain respondent's determination of the section 6653(a) additions to tax. In the amended petition, petitioner requested the Court to award attorney's fees. At the present time, this Court is without statutory authority to award attorney's fees even if it decides any or all of the issues involved for the petitioner. See Key Buick Co. v. Commissioner,68 T.C. 178 (1977), affd. 613 F.2d 1306 (5th Cir. 1980). Due to concessions by the parties, Decision will be entered under Rule 155.