ROBERT A. MACADAM AND BARBARA MACADAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
MacAdam v. Commissioner
Docket No. 106-87
United States Tax Court
T.C. Memo 1991-410; 1991 Tax Ct. Memo LEXIS 431; 62 T.C.M. (CCH) 565; T.C.M. (RIA) 91410; August 20, 1991, Filed *431 Decision will be entered for the respondent. Robert M. Gunn and Alan B. Roth, for the petitioners. James M. Klein, Edward J. Roepsch, and Edward G. Langer, for the respondent. WHALEN, Judge. WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' 1980 and 1981 Federal income tax of $ 4,288 and $ 1,178, respectively. The sole issue for decision is whether the losses realized by petitioners from trading commodity futures are capital losses which are subject to the limitation set forth in section 1211, or whether they are allowed as a deduction from gross income without limitation. All section references contained herein are to the Internal Revenue Code as amended. Our decision turns on whether the subject commodity futures qualify as capital assets within the meaning of section 1221. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts filed by the parties and attached exhibits are incorporated herein by this reference. During the taxable years at issue, Mr. MacAdam was self-employed as a commodities trader. His business consisted of the purchase and sale of *432 commodity futures for his own account. In connection with that business, he leased a seat on the Chicago Board of Trade as an associate member. He conducted his business on the floor of the Chicago Board of Trade where he daily traded up to approximately 100 contracts for the future delivery of U.S. Treasury Bonds. He was licensed as a broker, but did not operate as a broker. During the years at issue, he was not registered as a commodity dealer with the Board of Trade or the Commodity Futures Trading Commission. The parties have stipulated and we hereby find the following: 5. Mr. MacAdam was a "scalper" who, for the most part, entered into futures contract positions of United States Treasury Bonds. A "scalper" is a type of trader. 6. As a scalper on the Chicago Board of Trade, he would enter into a position in futures contracts attempting to purchase a position at the bid price and sell at the offered price. There is a small difference in these prices and a successful scalper can make reasonable profits due to the large amounts represented by the contracts. The market is volatile and the small differences can disappear almost immediately. 7. The only time Mr. MacAdam *433 had an open position at the end of a day was when an "out trade" occurred. An "out trade" is a dispute as to the specific details of a given transaction which dispute is subsequently resolved between the parties to the transaction. * * * 9. Mr. MacAdam did not engage in the purchase or sale of the futures contracts for the purposes of hedging against T-Bonds held by him in the ordinary course of a trade or business.
During the years 1980 and 1981, Mr. MacAdam sustained losses from his "scalping" business in the amount of $ 21,187 and $ 11,845, respectively. Petitioners deducted the loss for each year on Schedule C of their joint Federal income tax return. Respondent determined that the losses arose during both years from the sale or exchange of capital assets, and, thus, are subject to the limitation on capital losses, set forth in section 1211(b). Respondent determined that, as applied to petitioners, the limitation under section 1211(b) prohibited the deduction of the subject loss for each year because petitioners had already deducted their maximum capital loss for the year. Respondent treated the loss for each year as a long-term capital loss and he recomputed petitioners' *434 carryover of long-term capital loss. Respondent's notice of deficiency states as follows: The loss you claimed on Schedule C does not qualify as an ordinary loss. We have allowed instead a long-term capital loss which affects the amount of your carryover to subsequent years.
Schedules are attached to respondent's notice of deficiency which show his computation of petitioners' long-term capital loss carryover. We note that for 1980, respondent treated the entire loss reported by petitioners on Schedule C, $ 23,246, as a long-term capital loss, not just the portion of the loss realized from commodity futures transactions, $ 21,187. We further note that for 1981, respondent took into account no part of petitioner's loss from commodity futures transactions, $ 11,845. The record does not explain the justification for treating the subject losses as long-term capital losses, rather than as short-term capital losses. Similarly, in computing petitioners' capital loss carryover, it is not clear why respondent used $ 23,246 as petitioners' capital loss for 1980 and zero as petitioners' capital loss for 1981. In any event, petitioners have raised no issue with respondent's computation *435 of their capital loss carryover. Petitioners resided in Evanston, Illinois, at the time they filed the petition in this case. In this opinion, we sometimes refer to Mr. MacAdam as petitioner. OPINION The issue in this case is whether the commodity futures which petitioner traded on the floor of the Chicago Board of Trade during 1980 and 1981, consisting of contracts for the future delivery of U.S. Treasury Bonds, were capital assets in his hands. We have previously described the mechanics of trading commodity futures on the Chicago Board of Trade in Vickers v. Commissioner, 80 T.C. 394, 396-402 (1983). That discussion appears equally applicable to this case and we refer to it here. See also King v. Commissioner, 89 T.C. 445 (1987). Respondent determined that the subject commodity futures were capital assets in Mr. MacAdam's hands and that the losses which he realized during 1980 and 1981, accordingly, were subject to the limitation on capital losses set forth in section 1211(b). That limitation states as follows: (b) OTHER TAXPAYERS. -- (1) IN GENERAL. -- In the case of a taxpayer other than a corporation, losses from sales or exchanges *436 of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) whichever of the following is smallest: (A) the taxable income for the taxable year reduced (but not below zero) by the zero bracket amount, (B) the applicable amount, or (C) the sum of -- (i) the excess of the net short-term capital loss over the net long-term capital gain, and (ii) one-half of the excess of the net long-term capital loss over the net short-term capital gain. (2) APPLICABLE AMOUNT. -- For purposes of paragraph (1)(B), the term "applicable amount" means -- (A) $ 2,000 in case of any taxable year beginning in 1977; and (B) $ 3,000 in the case of any taxable year beginning after 1977. (3) COMPUTATION OF TAXABLE INCOME. -- For purposes of paragraph (1), taxable income shall be computed without regard to gains or losses from sales or exchanges of capital assets and without regard to the deductions provided in section 151 (relating to personal exemptions) or any deduction in lieu thereof.
Petitioners argue that the subject commodity futures were not capital assets in Mr. MacAdam's hands and that the losses which he realized *437 during those years are not subject to the above limitation but are fully deductible from gross income. Petitioners' argument is premised on the theory that, as a "scalper," Mr. MacAdam held the subject commodity futures "primarily for sale to customers in the ordinary course of his trade or business" and, accordingly, they fell within the terms of section 1221(1), which excludes from the term "capital asset" -- stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
At the outset, we note petitioners' stipulation that Mr. MacAdam was a "scalper" and that "a 'scalper' is a type of trader." We further note that in their post-trial briefs, petitioners refer to Mr. MacAdam as a "trader" and they describe his business activity as "trading commodity futures." For tax purposes, of course, a trader, as opposed to a dealer, is a person who, by definition, does not have "customers" in his trade or business and holds capital assets in his business. E.g., King v. Commissioner, 89 T.C. 445 (1987). *438 If the stipulation in this case were read to be petitioners' acknowledgment that Mr. MacAdam qualified as a trader for tax purposes, then it would follow that the commodity futures which he traded were not covered by the exception contained in section 1221(1) for property held primarily for sale to customers in the ordinary course of business. E.g., King v. Commissioner, supra at 450. Respondent does not argue that the stipulation should be read in that manner. Petitioners articulate their contention in the following terms: It is Petitioner's contention that under the doctrine of George R. Kemon v. Commissioner, [16 T.C. 1026 (1951)] those who acquire futures contracts with the expectation of quickly disposing of them at a profit and not in the expectation of a rise in value during the interval of time between acquisition and disposition, are dealing with customers and are not trading in capital assets. * * * Petitioner Robert A. MacAdam performed a service and had customers. He and other scalpers are an identifiable group on the Board of Trade who make a market by simultaneously offering to buy or sell. Brokers and others rely *439 on this market and deal with the scalpers to execute their orders and they or their clients are "customers" as the term is used in Section 1221(1). The fact that the Petitioner, Robert A. MacAdam's "position" may not be inventory is immaterial to the question of whether it is property held for sale, albeit briefly, to customers in the ordinary course of his business.
They emphasize that, as a "scalper," Mr. MacAdam purchased or sold futures contracts for immediate resale or repurchase at a profit, rather than with the expectation of a rise in value during the interval of time between acquisition and disposition. In petitioners' view, the fact that Mr. MacAdam acquired the subject commodity futures for resale means that "he functioned as a 'dealer'" because, as a scalper, he served to create a market for other members of the Board of Trade, and, accordingly, held the commodity futures "for sale to customers" within the meaning of section 1221(1). We disagree. The case on which petitioners principally rely, Kemon v. Commissioner, 16 T.C. 1026 (1951), involved a partnership which was engaged in "the buying and selling of unlisted securities for its own account." *440 Kemon v. Commissioner, supra at 1027. The partnership had realized profits from such business which the Commissioner sought to tax as ordinary income to the taxpayer who was a member of the partnership. In addressing respondent's argument that the partnership held securities primarily for sale to customers in the ordinary course of business, we first described the history and significance of the phrase "to customers" in the predecessor of section 1221(1). We stated as follows: Whether or not securities are held primarily for sale to customers in the ordinary course of business is a question of fact, Stern Brothers & Co., 16 T.C. 295, in which the crucial phrase is "to customers." This phrase and the word "ordinary" were added to the definition of capital assets by Senate Amendment No. 66 in the Revenue Act of 1934 so that a speculator trading on his own account could not claim the securities he sold were other than capital assets. The theory of the amendment was that those who sell securities on an exchange have no "customers" and for that reason the property held by such taxpayers is not within the above quoted exclusionary clause. *441 O. L. Burnett, 40 B.T.A. 605, 118 F.2d 659; Thomas E. Wood, 16 T.C. 213. [Kemon v. Commissioner, supra at 1032.]
We also noted that courts had employed "the merchant analogy" in determining whether the property was sold "to customers." Kemon v. Commissioner, supra at 1032-1033. Following that analogy in Kemon, we noted that the partnership had performed no merchandising functions and it had the same relationship to the source of supply as its "customers." Accordingly, we held that for tax purposes the partnership was not a dealer selling to "customers" but was a trader. Kemon v. Commissioner, supra at 1033-1034. We are at a loss to understand how the Kemon case supports petitioners' position that Mr. MacAdam sold "to customers" and was, accordingly, a dealer in 1980 and 1981. In our view, the opposite is true. Mr. MacAdam bought and sold commodity futures for his own account. As compared to the persons with whom he traded on the floor of the Chicago Board of Trade, he did not have a different source of supply of futures contracts; the commodity *442 futures which he traded were as accessible to the persons with whom he traded as they were to him. See Kemon v. Commissioner, supra at 1033. Moreover, like the partnership in Kemon, Mr. MacAdam sought to profit from the market price of the commodity futures and not from a markup of the commodity futures as would be charged by a middleman or dealer. He did not act as a middleman between buyers and sellers or perform any merchandising functions or services that required compensation by way of a markup of the commodity futures which he traded. See Kemon v. Commissioner, supra at 1033. The parties have stipulated that Mr. MacAdam bought a position at the "bid price" and hoped to sell at the slightly higher "offered price." In the case of a long position, he attempted to close the position while the market price remained the same or went up, so that he would realize a small profit. In the case of a short position, on the other hand, he attempted to close the position while the market price remained the same or went down. Petitioner's losses resulted from the fact that the market moved to his disadvantage more often or to a greater *443 extent than it moved to his advantage. Petitioners argue that by "simultaneously offering to buy at bid or sell at offered" Mr. MacAdam and other scalpers "create a market and perform a service." We agree that the actions of scalpers, that is buying and selling commodity futures on the floor of the Board of Trade, may create a market, but those actions are undertaken to effectuate their own trading objectives. They are not undertaken on behalf of other buyers and sellers; they are not the kind of merchant service to which the Court had reference in Kemon v. Commissioner, supra. The activity from which petitioner realized the subject losses, like the profitable activity of the partnership in Kemon, conformed to the customary activity of a trader in commodity futures, rather than to a dealer holding commodity futures primarily for sale to customers. See Kemon v. Commissioner, supra at 1034. Furthermore, this and other courts have universally held that a person who trades commodity futures for his own account does not have "customers" within the meaning of section 1221(1). See United States v. Diamond, 788 F.2d 1025 (4th Cir. 1986); *444 Faroll v. Jarecki, 231 F.2d 281 (7th Cir. 1956); Covington v. Commissioner, 42 B.T.A. 601 (1940), affd. in part and revd. in part 120 F.2d 768 (5th Cir. 1941); LaBorde v. Commissioner, T.C. Memo 1988-58, affd. without published opinion 868 F.2d 1270 (5th Cir. 1989); Swartz v. Commissioner, T.C. Memo 1987-582, affd. per curiam 876 F.2d 657 (8th Cir. 1989); Buehler v. Commissioner, T.C. Memo 1987-416. We believe that this case is controlled by those opinions, especially Faroll v. Jarecki, supra.In that case, the taxpayer, like Mr. MacAdam, was a member of the Chicago Board of Trade who bought and sold commodity futures for his own account on the floor of the Board of Trade. The Court of Appeals reversed the finding of the District Court that the taxpayer's purchases and sales of commodity futures were made "to customers." The Court of Appeals stated as follows: We think it clear from the record before us that absent hedging, Faroll was a trader. * * * We also think the inter-member transactions in commodity *445 futures operating in the "pit" are not, on these facts, sales to customers within the meaning of [the predecessor of section 1221(1)]. [Faroll v. Jarecki, 231 F.2d 281, 287 (7th Cir. 1956).]
We find and hold that Mr. MacAdam did not hold the futures contracts which he traded during 1980 and 1981 primarily for sale to customers in the ordinary course of his trade or business, and they qualify as capital assets within the meaning of section 1221. Therefore, the losses incurred by petitioners from Mr. MacAdam's trading are capital losses, subject to the limitation on capital losses set forth in section 1211(b). We note that respondent also argues that the subject commodity futures are "section 1256 contracts" as defined by section 1256(b) and, pursuant to section 1256, loss realized from trading such contracts after June 23, 1981, "shall be treated as a loss from the sale or exchange of a capital asset, unless the transaction involves ordinary income property." However, our holding that petitioner was a trader during 1980 and 1981, and not a dealer, requires petitioner's losses from trading commodity futures for the entire period at issue to be treated as losses *446 from the sale or exchange of capital assets. Accordingly, we do not reach respondent's second contention. To reflect the foregoing, Decision will be entered for the respondent.